OSBORNE et al. v. OZLIN et al.

No. 8.

District Court, E. D. Virginia.

Sept. 6, 1939.

Andrew D. Christian, Charles K. Woltz, and Christian, Barton & Parker, all of Richmond, Va., for plaintiffs.

Abram P. Staples, Atty. Gen., of Virginia, and, as such, for defendants.

Walter H. Bennett, of New York City, for amicus curiæ.

Before SOPER, Circuit Judge, and WAY and POLLARD, District Judges.

SOPER, Circuit Judge.

The bill of complaint in this case prayed that the State Corporation Commission and the Commissioner of Insurance of the State of Virginia be enjoined from enforcing the provisions of Ch. 218 of the Acts of the General Assembly of Virginia of 1938 on the ground that the Act violates the Constitution of the United States, so that an enforcement thereof would deprive the plaintiffs of their constitutional rights. A temporary injunction pending final determination and a permanent injunction were prayed. Accordingly, a temporary restraining order was passed and the court was organized to hear and determine the matter in controversy. Testimony was taken and arguments of counsel heard, upon which the court has made the findings of fact and conclusions of law herein set out.

The statute amends and reenacts Sections 4222, 4226-a and 4235 of the Code of Virginia relating to insurance, adds new sections as follows: Section 4221-a, defining certain terms, Section 4235-b, requiring registration of solicitors, and Section 4235-c, exempting certain reciprocal or interinsurance exchanges from the provisions of the Act. Section 168 of the Tax Code of Virginia is repealed. Sections 4222 and 4226-a are the objects of attack in this suit.

Section 4222 forbids insurance companies, legally authorized to do business in Virginia, except life, title and ocean marine insurance companies, to make contracts of insurance or surety on persons or property therein except through regularly constituted and registered resident agents, and provides that no such contract shall be written, issued or delivered unless it is duly countersigned by a resident agent. No state agent, special agent, company representative or other salaried officer or manager of an insurance company, except a mutual insurance company, is permitted to countersign any contract of insurance or surety.

Section 4226-a provides that no resident agent may write, countersign or deliver any contract of insurance or surety upon persons or property in the state, unless there be collected at the time of writing or delivery, or within a reasonable time thereafter, the full premium on the contract, and the resident agent shall be entitled to and shall receive the usual and customary commissions allowed on such contract. A resident agent is not permitted to write a contract produced by a non-resident broker not licensed by Virginia, and may not pay a licensed non-resident broker more than fifty per cent of the resident agent's commissions. A non-resident broker is any non-resident who solicits for compensation contracts of insurance or surety on persons or property located in the state, except contracts of life, title or ocean marine insurance.

Section 4221-a defines an "agent" as any individual, who solicits, negotiates or effects on behalf of any insurer, contracts of insurance or surety; and defines a "resident agent" or "resident insurance agent" as an individual whose residence and principal place of business are located within the state, and who is authorized to transact business as an insurance agent and to contract in the name of the insurer. "State agent", "special agent" or "company representative" means any person who acts for and on behalf of an insurer in the solicitation, inspection or servicing of risks assumed by the insurer. These definitions do not apply to life insurance companies or life insurance agents.

Sections 4231 and 4180 of the Virginia Code subject an insurance company which fails to comply with the provisions of the statute to fines, or suspension or revocation of its license to do business in Virginia, or both.

The plaintiffs in the suit are thirty-four foreign or alien stock companies licensed to conduct in Virginia the casualty insurance or surety business, or both; and three individuals who have their residence and principal place of business in the state as salaried agents and Richmond branch managers of certain company plaintiffs. These individuals were licensed by Virginia as resident insurance agents prior to June 21, 1938, the effective date of the

statute in question, and since that time have been licensed as special agents or company representatives. The defendants are officials of Virginia, charged with the administration of the insurance law of that state. The National Association of Insurance Agents was allowed to intervene as amicus curiæ.

From the evidence in the case offered to show the effects of the enforcement of the statute, we find the following facts with regard to the production and servicing of casualty insurance and surety contracts:

### Production of Casualty and Insurance Contracts.

Contracts are secured by persons known as producers, who solicit the public. The producer is either an agent or a broker, licensed by the state in which he acts. An agent is certified and sponsored by a company and, in a sense, is a representative of the company; but as he is paid a commission on the business he produces, which depends in large measure upon his influence in his community, and the services he renders his clients, he is to a great extent the agent of the insured. A broker, on the other hand, has no affiliation with any company. His obligation runs only to the insured; but like the agent, his success depends upon his salesmanship and his reputation and experience as an insurance man.

The producer must induce the insured to buy the insurance through him, and must inform the insured as to the exposure and the coverage. The producer must have the good will and confidence of the insured, particularly when the prospect must disclose confidential information as to his business bearing upon questions of exposure and coverage, as in workmen's compensation or surety contracts. The successful producer must have a sound technical knowledge of these questions, and often must procure special rates for his clients in order to hold their business. The solution of these questions may be a routine matter or a complicated task. Hence if they are determined, the procurement and acceptance of the policy, that is, the "underwriting", is the next step in the process, and if the producer is authorized to bind the company, he must determine on its behalf whether to make the contract.

Policyholders are regarded as the customers or clients of the producer. During the life of the policy he performs every service to build up and maintain a clientele.

He extends credit for payment of the premium, explains the provisions of the policy to the assured, assists the filing and recovery of a claim of loss, and acts throughout as the mediator between the assured and the company.

Brokers are rarely found except in large cities. In New York they produce virtually all the contracts, for the demand for insurance is so concentrated and has assumed such tremendous proportions that insurance is bought rather than sold. The producer represents the buyer, and remains free of company affiliation in order to use the assured's concentrated bargaining power to its best advantage when dealing with the various companies.

The production process is the same when the contract is produced in one state to cover risks in another. Richmond agents produce insurance to cover risks in other parts of Virginia and in other states, and New York brokers produce contracts to cover exposures in all parts of the country. In fire insurance, it has been the custom for many years for the producer to associate with the contract and to split the commission with an agent who does business in the vicinity of the risk. There is no such custom in the casualty and surety business; a producer of casualty or surety contracts covering exposures in remote places usually relies exclusively on the company to service the contract, and a New York broker generally places the insurance with the company best able to do so. For this reason, a producer seldom insures against a risk with a company not admitted to do business in the state where the exposure exists.

### Servicing the Contract.

One of the most important services afforded assureds is what is known as "servicing the contract", that is, the discovery and elimination of unsafe conditions, whereby the question of loss and the cost of insurance is diminished. For this purpose, the insurance company maintains a staff of engineers who inspect the risks covered by the company. The producer not only ascertains whether the assured is receiving proper attention from this servicing personnel, but also makes his own investigations and recommendations in order to reduce the client's rating and expense. These services by brokers and agents are an essential part of the production process in meeting the competition for business.

## Field Supervision.

Another essential part of the production process is known as "field supervision". The companies employ field supervisors to stimulate and guide the activities of local producers, to accept or reject orders for contracts from producers, to underwrite, prepare and check contracts, to collect premiums and generally to represent the company in a particular territory. The two major classes of field supervisors are: (a) The general agent, who is licensed as a producing agent and is compensated solely by commissions based on premiums on contracts made by him or by producers appointed by him and acting under his supervision. In New York City, where most of the contracts are produced by brokers, the general agents do not appoint producers, for it is more profitable not to compete with brokers but to underwrite the insurance produced by them. General agents are men of knowledge and experience who devote their full time to the business. In Virginia, the general agents produce the bulk of the local business. (b) The branch office manager or salaried company representative who has the same powers and duties as the general agent, but is compensated by a salary and receives no commission for producing business. Whenever a branch manager negotiates a policy directly with an assured, the rule of the National Association of Insurance Agents, in which most insurers have acquiesced, requires that the contract be closed through one of the manager's commission agents who is paid the full producer's commission. The manager's function is to develop his territory through ordinary producing agents and to supervise and assist them in the production of desirable business.

## Production Cost.

The "production cost" of getting the business is divided into two factors: (a) "Acquisition Cost", or the commission paid the producing agent or broker. This commission, which varies in amount and is on the average of 13.5% of the premium, is normally the only compensation that the producer receives. It is allocated as the recipient sees fit. No stock company will negotiate a contract directly with an assured without paying a producer's commission either to a broker or a non-salaried agent. (b) "Field Supervision Cost", that is, the amount paid the general agent for field supervision, and the limit which the company may spend for maintaining its branch offices. This factor is usually about 6.5% of the premium. When a general agent produces a contract, he is given the entire production cost. When a broker, solicitor or other commission agent produces a contract, he receives the acquisition cost, and the general agent or branch manager under whose supervision or within whose territory the producer is working receives the field supervision cost. The maximum amounts which may be paid these various individuals are regulated by an association known as the Acquisition Cost Conference, to which nearly all casualty and surety companies belong.

## Non-resident Production of Contracts Covering Virginia Risks.

The practices described are followed in the production of policies outside Virginia to cover risks in that state. The statutory restrictions upon this business form the crux of this suit. From 10 to 20% of the total premiums of each company plaintiff for Virginia coverage is paid on contracts produced outside of Virginia, i. e., negotiated, ordered, underwritten, prepared, checked, executed, issued and delivered outside of Virginia. During 1937 twelve of the company plaintiffs received premiums of $410,967.62 on policies of Virginia coverage produced outside the state, and paid commissions of $70,860.96 to non-residents for the production thereof. Ten of these companies (the figures for the other two are not available) during the first half of 1938 received $183,727.38 for such policies, and paid $31,635.53 to nonresidents for this production. The total premiums paid to the plaintiff companies during 1937 on contracts produced outside Virginia amounted to approximately $1,371,574.

The party assured by a policy produced outside of Virginia is occasionally a natural person who keeps his records and manages his business outside the state, and has interests in Virginia and elsewhere. But, ordinarily, the assured is a large national corporation, incorporated in any of the states, with its central office in New York, Chicago or some other great business center. One company plaintiff insures a mercantile corporation against the risk of public liability arising from the operation of 258 stores scattered throughout Virginia. Nation wide manufacturers, distributors, financial institutions, contractors, dairy companies, public utilities and others purchase contracts outside of Virginia to cov-

er exposures which they have in that state. These contracts are produced almost exclusively by brokers operating in large cities where the national corporations have their principal offices, and the great majority of this business is produced in New York City, which has become the center for the insurance business in this country. Many of these out-of-state producers are licensed by Virginia as nonresident brokers.

Practically all of the policies produced outside Virginia and insuring persons or property therein are what may conveniently be called multiple-coverage, hotchpotch or master policies, for the reason that they insure against numerous exposures of the same type which are usually situated in other states as well as Virginia. It is unusual for different lines of insurance, such as fire, workmen's compensation, automobile or burglary, to be combined in the same contract.

It is as important that the insurer be licensed to do business in Virginia when a contract for Virginia coverage is produced in another state as when it is produced by a resident agent. The fact that a company is licensed to do business in the state of coverage is an important factor in the placing of insurance, for if the insurer does not have such a license, the assured loses the benefit of all company services in the state of the exposure, which is the very place where he needs them most, and the assured also can not sue to recover a loss in that state.

*The Reason for Out-of-State Production.*

An individual non-resident, subject to exposures in Virginia, is likely to purchase his insurance through a friend at his residence or place of business. The officers of a national corporation are also influenced by this personal element; but the chief reason for the concentration of their insurance buying in New York or other large center is the reduced cost. A great number of large corporations employ high salaried officers, whose sole function is to handle their insurance because advantages inhere in the concentration of insurance buying as in the mass purchase of commodities. The average rates for fidelity insurance is 50¢ per hundred; but if a bond for millions of dollars is purchased to cover the employees of a nation-wide chain of stores, then the rate is 25¢ or 30¢ per hundred.

The solution of the insurance problems of an assured subject to numerous expo-

sures is greatly facilitated by the centralization of insurance buying. It is easier to insure against many risks by the procurement of one policy and the payment of one premium therefor; and the assured is better able to place the responsibility for proper coverage of its risks in its insurance manager.

Other conveniences and economies result from the centralization of insurance buying. In many localities of exposure, there are no resident agents capable of handling a large corporation's insurance. Such a corporation does not have in the localities of its exposures representatives authorized and qualified to attend to its insurance matters, or the records necessary for transacting the business. Multiple coverage policies are usually rated on the accident and loss record for the combined risks, and such rating cannot be determined properly if each exposure must be insured separately through local resident agents.

The controlling reason, however, for the out-of-state production of hotchpotch or master policies covering persons or property in Virginia is the lower rate obtained for Virginia risks. This result is accomplished by some form of special rating, e. g. "retrospective rating", whereby the premium is retroactively reduced or increased, according to the favorable or unfavorable experience of the risk, "experience rating", which is based upon the application of an inflexible formula to the history of the losses of the assured, or "equity rating", which involves some flexibility of judgment in the formulation of rates lower than those developed by a fixed formula, and usually includes some reduction in the amount of the producer's commission. Reduction in the cost of the insurance of a large corporation is sometimes secured by inviting the brokers to make competitive bids. The broker usually gets the business who offers the best price, and he frequently contributes to this result by reducing the customary commission. In general, the lower premiums involved in the "rating" and "pricing" of policies of large corporations are the result of quantity purchasing, improved loss experience from scientific servicing of risks, and intelligent underwriting of combinations of coverages.

*Effect of Non-Resident Production in the State of Virginia.*

Insofar as inspection and engineering services preceding or accompanying the

formation of a contract covering a Virginia risk are concerned, and insofar as the services of inspectors and adjusters are required in case of loss after the execution of the policy, there is no difference between a contract produced within and a contract produced without the state. The ability of the company to perform the services in the state of coverage necessarily affects the placing of the insurance.

The production of from 10 to 20% of Virginia coverage outside the state is of course attended by a loss of business and of revenue by insurance agents resident in Virginia. In 1937 $9,143,833 was paid in premiums on casualty and surety contracts covering Virginia risks. Producers' commissions at 13.5% amounted to $1,234,417; and assuming that 15% of the coverage was produced outside the state, the resident agents of Virginia lost $185,161 which they would have earned if the business had been produced within the state.

Producers in New York and other large business centers, by reason of their location, have a great competitive advantage over the Virginia agents. The latter do not have the opportunity to acquire the information and experience that will acquaint them with the insurance market and render them expert in the rating and underwriting of multiple risks. A statutory requirement compelling the association of the resident agent with all Virginia risks would tend to overcome the handicap under which he now labors.

Under present out-of-state production technique, Virginia casualty and surety companies, not doing business on a national scale, cannot compete with large foreign corporations for 10 to 20% of the insurance on persons and property within the state, since the small domestic companies cannot offer reduced premiums on hotchpotch and interstate contracts with Virginia coverage included.

The interests of Virginia residents, merchants, industrialists and business men, who are not subject to numerous risks in various states, are also affected. These persons compete with national corporations for Virginia business and are handicapped by being required to pay more for their Virginia insurance then their large competitors who buy hotchpotch policies outside the state. The local grocer, for example, pays more for his insurance than does the chain store.

Out-of-state production of insurance contracts makes more difficult the enforcement of the insurance laws of the state. Virginia has many statutes relating to the casualty insurance and surety business. No foreign corporation may make such contracts on persons or property in Virginia unless it obtains a certificate of authority to transact business from the Virginia Corporation Commission by filing two copies of its charter, paying the requisite entrance fee and fulfilling certain other statutory requirements. Virginia Code Sections 3847 and 4176. The Commission may prevent any insurance or surety company, which is insolvent or fails to comply with any provision of law, from doing business in Virginia. Section 4180. No insurance company or agent shall pay, or allow, as an inducement to have any contract of insurance or surety issued, any rebate of premium or any special favor or inducement not specified in the contract. Section 4222(c). Every company issuing workmen's compensation or automobile insurance or contracts of surety must file schedules of its rates with the Corporation Commission and procure its approval of the same. If, upon a hearing, the Commission feels that the rates proposed by any company are unfair, unreasonable or discriminatory, then it may prescribe a different schedule of rates. Sections 1887(75), 4326a1, 4350(3). In these three lines where rates for Virginia coverage are fixed by law, "equity" and "retrospective" ratings are not allowed. Automobile liability policies issued to public carriers must be filed with the Corporation Commission, and workmen's compensation policies must be filed with the Industrial Commission. All of these laws apply to insurance produced outside the state as well as to contracts produced within.

The out-of-state production of Virginia coverage makes it difficult to enforce certain of these laws, particularly those dealing with insurance rates. A good example of virtual nullification of Virginia's rate fixing statutes is a contract covering risks in various states and rated on an interstate basis, such as a policy covering risks in Virginia and West Virginia. If West Virginia does not regulate the rate, it is easy to dilute the Virginia fixed rate by setting an arbitrary figure as the price for the West Virginia coverage. In the same way, retrospective rating applied to the West Virginia coverage can in effect operate to

reduce the premium for the Virginia coverage. Thus an interstate rate may result in great savings to the assured, in spite of the fact that it is against the law of Virginia for the assured to be granted such reductions. It is equally difficult to enforce the law (Code, Section 4222(c) as amended in 1938) against rebates and special favors when the policy is produced beyond her borders. In a contract covering risks in Virginia and other states, it is easy to grant a rebate and attribute it to risks in states other than Virginia when, in reality, but for the rebate or favor, the contract would not have been purchased. In the absence of some one within her jurisdiction connected with the production process, it is difficult for Virginia to prevent violations of these statutes.

### The Probable Effect of the Resident Agent Requirement of the Act of 1938.

In estimating the effect of the Act upon the insurance business, the experience of Virginia, under prior acts passed for the same general purpose should be considered. The Acts of Virginia of 1895–96, c. 224, p. 258, required in effect that contracts for fire insurance on property in Virginia should be made through resident agents. The Acts of 1902, c. 624, p. 738, made similar provision for casualty and surety contracts covering Virginia risks; and the codification by the Acts of 1906, c. 112, subc. 2, p. 122, sections 34 and 38, required all insurance on persons or property in the state to be placed through resident agents. In 1921, the foregoing legislation was interpreted by the State Insurance Commissioner to require that all insurance on persons or property within Virginia should be issued under a policy separate from insurance on persons or property in any other state; that if the Virginia risk should be covered under a general cover contract form, it should include only Virginia property; that the rates should be those applicable to risks covered as published by the Rating Bureau of which the insurer was a member; and that the policy should be issued through and signed by a resident agent who should receive the usual commission, but this last provision did not apply to company employees who received a fixed salary. See also the Acts of 1936, c. 104, p. 169.

Prior to the Act of 1938, the resident agent who countersigned a policy produced outside the state performed no useful function in the production, underwriting or servicing of the contract. The plaintiffs' brief states: "Companies have never observed the mandate of the statute not to make contracts (outside of Virginia) except through licensed Virginia agents. * * * When, because of the compulsion of the law of a state of coverage, the company must secure the countersignature of a licensed agent there, he may countersign only a 'law rider' or a 'countersigning endorsement'. He may sign one of a number of 'underlying contracts' retained by the company, while a 'master contract' is delivered to the assured." Customarily, contracts produced outside of Virginia have been countersigned by the general agents and branch office managers without compensation. They have not performed any of the services habitually offered the assured by a resident producer; but these services have been rendered by the non-resident producer and by the companies' salaried employees, such as engineers and adjusters, particularly the latter, when the matter has been one that could not be handled by a producer remote from the locality of the coverage. Prior to the Act of 1938, the Virginia resident agent statute requirements have had no real effect on the production of the contracts.

The Act of 1938 is more drastic than its predecessors, in that it requires that the resident agent be paid and retain at least one-half of the customary commission, and forbids a salaried representative of the company to countersign the policy. The Act will not affect the production of insurance contracts covering a single or a small number of risks, since these are placed almost entirely through resident agents, but it will substantially affect the production of hotchpotch or master policies outside the state, since in every case at least 50% of the acquisition cost thereof must be paid to a Virginia agent. Thereby the cost of the insurance on Virginia risks will be increased; for if the assured buys directly from a Virginia agent, he will lose the great advantage inherent in the concentration of his buying power; and if he buys from a non-resident broker, he must pay a commission both to the broker and the resident agent. The amounts now paid the out-of-state producer are not shown to be excessive, and it is not to be expected that he will render the same services for one-half of the compensation.

Whether or not, in view of the Act of 1938, Virginia risks will still be covered by master policies produced outside the state depends on whether the advantages for purchasing the insurance in New York or other business center will outweigh the increased cost of the Virginia insurance. The probability is that in many cases, the saving will still exceed the increased expense unless the Act prevents the cutting of rates denounced by the Virginia statutes. For example, if the usual rate of 50¢ per hundred on a fidelity bond is reduced to 25¢ per hundred in the case of a Five Million Dollar fidelity bond of a chain store organization, as the evidence indicates, the reduction in cost of the Virginia coverage would far exceed one-half of the usual commission which the resident agent is required by the statute to retain.

Under the practice prevailing prior to the passage of the Act of 1938, the countersigning by a salaried representative of the company of a policy produced outside the state was only a perfunctory act, unaccompanied by any service to the assured or by any compensation to the signer. It does not follow that the same practice will prevail under the present statute which requires the retention of one-half of the commission by the resident agent. On February 13, 1938 the Virginia Association of Insurance Agents, Inc. passed a resolution with reference to the Act wherein it was declared that in all cases where a Virginia agent is associated in writing a Virginia fire, casualty or surety policy, he shall familiarize himself with all the pertinent facts relating thereto, examine the policy to ascertain whether it is correct as to rate and coverage and best adapted to the needs of the assured, and throughout the life of the policy render the same obligation to the assured with respect to servicing the contract as if the Virginia agent alone had negotiated the contract. On February 27, 1939, the chief examiner of the Virginia Insurance Bureau made an interpretation of the statute, wherein he held that a Virginia resident agent, countersigning a contract, has imposed upon him ipso facto "the same obligations with respect to supervising the contents and form of the contract, and with respect to future services to be rendered during the life of the contract, both to the assured and to a company plaintiff in connection therewith, as customarily applied in cases where the resident agent himself negotiated a similar contract."

█ This resolution and this interpretation were offered in evidence by the defendant, and were objected to by the plaintiffs as nothing more than self-serving arguments as to the meaning of the statute, promulgated after the institution of the pending suit on November 10, 1938. We are in accord with the view that these documents should have no weight in determining the controversy, except insofar as they constitute arguments on the part of the defendants as to the interpretation of the statute, and its probable effect. Considered in this way, they are not without some persuasive force. It is true that the plaintiff companies and the assureds have been content with the prior practice, and have felt no desire or need for the services of the local agent in the production and servicing of master policies; if the local agent must be paid one-half of the commission, he will doubtless be called upon to render such services as he may be qualified and able to perform, even though the statute merely provides that the contracts shall not be made except through resident agents and except with their countersignature thereon. Such agents could be of assistance in checking the coverage and premium, servicing the contract, adjusting claims of loss, and acting in general as the mediator between the assured and the insurer in the locality of the exposure.

█ The plaintiff objected to evidence offered by the defendant as to certain customs in the fire insurance business with reference to a payment of a share of the commission to the Virginia agent in case of a contract produced outside the state covering a location therein. From 5 to 10% of the amount of the premium has been customarily paid to the local agent, regardless of the connection or lack of connection of the agent with the transaction. In our opinion, the evidence was material, and the objection should be overruled. Conditions with reference to casualty and surety insurance differ from those that prevail in fire insurance, but nevertheless the evidence of the custom voluntarily adopted in one line has some bearing on the reasonableness of the Act which imposed a similar custom as a duty on another line of the same general business.

The plaintiffs contend that the statute is invalid because it attempts to regulate the making, outside of Virginia, of contracts of insurance, in that it provides that insurance companies shall not make con-

tracts of insurance or surety on persons or property within the state except through regularly constituted and registered resident agents; and that no resident agent may write, countersign, issue or deliver any such contract, upon persons or property within the state, unless there shall be collected the full premium on the contract; and that the resident agent shall be entitled to, and shall receive the usual commission, and shall not allow or pay to any licensed non-resident insurance broker more than 50% of the commission. It is said that the State of Virginia, by the passage of the Act which applies to contracts executed without the state as well as contracts executed therein, assumes the right to exercise beyond its territorial limits legislative authority which exceeds the limitations imposed by the federal constitution; and that the Act is not saved by the fact that the contracts of insurance to which it relates cover exposures and involve acts of performance within the state.

■■■ It is a well established general principle that the due process clause of the Fourteenth Amendment U.S.C.A. "denies to a state any power to restrict or control the obligation of contracts executed and to be performed without the state, as an attempt to exercise power over a subject matter not within its constitutional jurisdiction"; and this is true although one of the contracting parties is within the state. Alaska Packers Ass'n v. Industrial Accident Commission, 294 U.S. 532, 540, 55 S.Ct. 518, 520, 79 L.Ed. 1044. This principle has been applied to statutes affecting contracts of insurance executed beyond the confines of the state; Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; St. Louis Compress Co. v. Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297; New York Life Ins. Co. v. Head, 234 U.S. 149, 161, 34 S.Ct. 879, 58 L.Ed. 1259; New York Life Ins. Co. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 46 S.Ct. 331, 70 L.Ed. 664; Connecticut General Life Ins. Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673. It has been held that the mere residence within the state of an assured under a life policy executed outside the state, or the mere existence of property in the state covered by a policy executed outside the state, does not of itself empower the state to regulate or

modify the terms of the contract or justify the imposition of tax on premiums. New York Life Ins. Co. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772, Ann. Cas.1918E, 593; Aetna Life Ins. Co. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342; St. Louis Compress Co. v. Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297; Palmetto Fire Ins. Co. v. Connecticut, 272 U.S. 295, 304, 47 S.Ct. 88, 71 L.Ed. 243; Compania General De Tabacos v. Collector, 275 U.S. 87, 48 S.Ct. 100, 72 L.Ed. 177. But it does not follow that the state has no jurisdiction under any circumstances over contracts of insurance made outside of the territory which relate to subject matter within its borders or affect the interests of its citizens. The border line between what is permissible and what is not is not always easy to draw; but specifically, it has been held that a state tax upon premiums received by a foreign insurance company from business done without the state may be assessed upon premiums paid to the company outside the state by the residents thereof. The tax was held to be a tax upon the privilege of doing business within the state. Equitable Life Society v. Pennsylvania, 238 U.S. 143, 35 S.Ct. 829, 59 L.Ed. 1239. The court said (238 U.S. pages 146, 147, 35 S.Ct. page 830, 59 L.Ed. 1239):

"It being established that the relation of the foreign company to domestic policy holders constituted doing business within the meaning of the statute, the question is whether the company may be taxed in respect of it, in this way, whatever it may be called. We are dealing with a corporation that has subjected itself to the jurisdiction of the state; there is no question that the state has a right to tax it, and the only doubt is whether it may take this item into account in fixing the figure of the tax. Obviously the limit in that regard is a different matter from the inquiry whether the residence of a policy holder would of itself give jurisdiction over the company. The argument of the state court is that the company is protecting its insured in Pennsylvania equally whether they pay their premiums to the company's agent in Philadelphia or by mail or in person to another in New York.

"These are policies of life insurance, and, according to the statement of the plaintiff in error, are kept alive and renewed to residents of Pennsylvania by payments from year to year. The fact

that the state could not prevent the contracts, so far as that may be true, has little bearing upon its right to consider the benefit thus annually extended into Pennsylvania in measuring the value of the privileges that it does grant. We may add that the state profits the company equally by protecting the lives insured, wherever the premiums are paid. The tax is a tax upon a privilege actually used."

This case was followed by Compania General De Tabacos v. Collector, 275 U. S. 87, 48 S.Ct. 100, 72 L.Ed. 177, where the court sustained a tax upon premiums from fire insurance policies on property within the Philippines, which premiums were received by a foreign insurance company licensed to do business in the islands. The court said (275 U.S. page 98, 48 S.Ct. page 104, 72 L.Ed. 177): "Does the fact that, while the Tobacco Company and the London Company were within the jurisdiction of the Philippines, they made a contract outside of the Philippines, for the insurance of merchandise in the Philippines, prevent the imposition upon the assured of a tax of 1 per cent. upon the money paid by it as a premium to the London Company? We may properly assume that this tax placed upon the assured must ultimately be paid by the insurer, and treating its real incidence as such, the question arises whether making and carrying out the policy does not involve an exercise or use of the right of the London Company to do business in the Philippine Islands under its license, because the policy covers fire risks on property within the Philippine Islands which may require adjustment and the activities of agents in the Philippine Islands with respect to settlement of losses arising thereunder. This we think must be answered affirmatively under Equitable Life Society v. Pennsylvania, 238 U.S. 143, 35 S.Ct. 829, 59 L.Ed. 1239."

See also Palmetto Fire Ins. Co. v. Connecticut, 272 U.S. 295, 47 S.Ct. 88, 71 L.Ed. 243. Compare, Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178, 92 A.L.R. 928, where it was held that a statute of limitations of the state where the breach occurred and the suit was brought upon a contract of suretyship, did not supersede the limitations specified in a valid contract of insurance made outside the state covering defalcations anywhere, since the performance in the state of suit involved at most only the casual payment of money and a state may not draw to itself control over contracts validly made elsewhere regardless of the relative importance of the interests of the forum with those created at the place of contract. See also Alaska Packers Ass'n v. Industrial Accident Commission, 294 U. S. 532, 547, 55 S.Ct. 518, 79 L.Ed. 1044. The test is this, according to Mr. Justice Brandeis dissenting in New York Life Ins. Co. v. Dodge, 246 U.S. 357, 382, 383, 38 S.Ct. 337, 343, 62 L.Ed. 772, Ann.Cas. 1918E, 593: "Is the subject-matter within the reasonable scope of regulation? Is the end legitimate? Are the means appropriated to the end sought to be obtained? If so, the act must be sustained, unless the court is satisfied that it is clearly an arbitrary and unnecessary interference with the right of the individual to his personal liberty."

It will have been observed that in the aforegoing cases, it was considered an important circumstance if the insurance company, like the plaintiff companies in the pending case, was doing business under license from the state whose legislation was the subject of attack. This feature was emphasized in Bothwell v. Buckbee, Mears Co., 275 U.S. 274, 48 S.Ct. 124, 72 L.Ed. 277, which concerned a policy of strike insurance covering a risk in Minnesota and written by an insurance company not licensed to do business therein. The contract required the performance of certain acts, and gave the company the right to do other acts within the state, all of which constituted activities of the insurance business which an unlicensed company was forbidden to perform. These circumstances, the court held, justified the refusal of the state to enforce the contract.

In Equitable Life Ins. Society v. Pennsylvania and Compania General De Tabacos v. Collector, supra, a tax on premiums was sustained because of activities of the insurer in connection with the contract, performed or contemplated, constituted an exercise of its license to do business in the state. These authorities are pertinent on the question of jurisdiction although some of them relate to taxation with which we are not concerned in the pending case, for taxation is regulation. Compania General De Tabacos v. Collector, 275 U.S. 87, 95, 48 S.Ct. 100, 72 L.Ed. 177, and whatever a state in the exercise

of its police power may regulate, it may subject to taxation. Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 425, 426, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293.

As it has been shown in the findings of fact that the contracts of the plaintiff companies on persons or property within Virginia call for or contemplate the performance of certain acts within the state, and it follows that the state has power to regulate them, the question is whether the statutory requirement that the insurance contract be made through a resident agent, who shall be paid at least one-half the commissions, has a reasonable relation to the risk covered by the contract and to the performance within the state of the obligations undertaken by the insurer.

■ The plaintiffs contend that the sole purpose of the statute is to profit the resident agent, to the detriment of the non-resident broker, the salaried resident agent, the insurance company and the insuring public. That one purpose and effect is to increase the income of the resident agent is undeniable, but we think that that is not the only purpose or probable effect. The important object of the statute is to require that all policies shall be placed by a resident agent, who shall take a real and not merely a nominal share in the placing of the business and in the performance of the contract. Of this main purpose the requirement of countersignature by the resident agent is only a minor and incidental part, of little importance except as indicating that the resident agent shall become an active factor in the business, especially when coupled with the major requirement that he shall be entitled to the whole commission of which he must retain one-half. The latter requirement, it is reasonable to conclude, will probably lead to greater participation on the part of the resident agent and he will be expected to render to the company and to the assured all the services of which he is capable. The tendency will be to create a more efficient agency force with the result that the local interests of the insured will be better served.

■ It is of equal importance that the creation of greater responsibility on the part of the resident agents, whom the state can reach and control, will assist the state in putting into effect statutes passed for the regulation of the insurance business.

It will not be so easy for the foreign insurance companies, the non-resident brokers and the insured to evade the prohibitions against rate cutting and rebating of commissions, designed to protect the insured resident in Virginia and the local insurance companies against the great advantages of business of national scope. Information as to illegal practices, which the resident agent will acquire, may be made available to the state. The effects of the statute may be less favorable than this prognosis indicates, but it is not an unreasonable one, and in any event, the burden is on those who attack the statute to show that it is devoid of legitimate purpose.

■ We conclude that Virginia is not without jurisdiction to pass a statute affecting the production of out-of-state contracts issued by companies licensed to do business in the state. Is the method adopted by the statute of 1938 so arbitrary and unreasonable as to be beyond its authority, that is to say, is it a proper exercise of the police power of the state which may be used to promote the public health, morals, safety, convenience and prosperity? Eubank v. Richmond, 226 U.S. 137, 142, 33 S.Ct. 76, 57 L.Ed. 156, 42 L.R.A.,N.S., 1123, Ann.Cas.1914B, 192; Nebbia v. New York, 291 U.S. 502, 503, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330. We think that the Act is within the power of the state. The plaintiffs complain of the exaction of one-half of the commission as the share of the resident agent; but it cannot be denied that such an agent can render services of substantial value. The actual practice in the fire insurance business in Virginia and elsewhere in the United States is of great significance in this respect. For many years it has been customary for fire policies to be signed by the resident agent, and he has been paid the full commission if he has negotiated the policy, and one-half commission if he has not negotiated the policy. In view of this experience, how can it be said that the application of a like rule to the casualty and surety business is arbitrary?

■ The provision for countersignature needs little discussion. Such a requirement is quite common throughout the United States. The present statutory provision that the signature of a com-

mission rather than a salaried agent shall be affixed to the policy is imposed as a safeguard to make certain that the commission agent, whose cooperation in the enforcement of the insurance statutes is desired, shall have knowledge of the issuance of policies and of his right to share in the commissions and in the subsequent activities under the contract. The salaried agent has no real complaint of discrimination against him since it is admitted that his association with business originating outside of the state has been entirely nominal and perfunctory in the past, unaccompanied by any real share in the business, or any compensation for his signature.

We do not overlook the peculiar situation of the non-resident assured who form no part of the Virginia public which the state desires to protect. Undoubtedly their business methods will be disturbed by the enforcement of the statute. It is contended, not without merit, that they have no need for the services of the resident commission agents, and that in fact, the latter cannot assume the function of producing agents in their behalf without harmfully intruding themselves into confidential business affairs. Moreover, it is fair to say that these affairs are so important and so widespread in their scope as to be beyond the technical knowledge and skill of the average Virginia agent, and that the interests of the non-resident assureds can be best looked after by the brokers at the great centers of population where the head offices of the insurance companies and of the assureds are located, and in Virginia by the engineering and claim personnel of the companies. It is also true that the substantial compensation required by the statute to be paid to the Virginia agents will increase the cost of the business.

These circumstances are not without material bearing in considering the reasonableness of the statute; but when they are weighed against the considerations above outlined, the conclusion still remains that the statutory provisions are not so unreasonable and arbitrary as to render the legislation void. It is for the legislature of the state to determine what economic policy will best serve the interest of its citizens, and to this end it may regulate or even prohibit a particular type of business in order to promote what it deems to be the public welfare. In pas-

sing upon the right of the state to impose on chain stores a graduated tax which increased in rate in proportion to the number of stores, the Supreme Court had this to say in Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 425, 57 S.Ct. 772, 777, 81 L.Ed. 1193, 112 A.L.R. 293:

"* * * In the exercise of its police power the state may forbid, as inimical to the public welfare, the prosecution of a particular type of business, or regulate a business in such manner as to abate evils deemed to arise from its pursuit. Whatever a state may forbid or regulate it may permit upon condition that a fee be paid in return for the privilege, and such a fee may be exacted to discourage the prosecution of a business or to adjust competitive or economic inequalities. Taxation may be made the implement of the exercise of the state's police power; and proper and reasonable discrimination between classes to promote fair competitive conditions and to equalize economic advantages is therefore lawful.

"If, in the interest of the people of the state, the legislature deemed it necessary either to mitigate evils of competition as between single stores and chains or to neutralize disadvantages of small chains in their competition with larger ones, or to discourage merchandising within the state by chains grown so large as to become a menace to the general welfare, it was at liberty to regulate the matter directly or to resort to the type of taxation evidenced by the Act of 1934 as a means of regulation. The appellants, by incorporating in some other state, or by spreading their business and activities over other states, cannot set at naught the public policy of Louisiana. The claim is, essentially, that even if local evils flow from the appellant's methods the state cannot control those evils because its power is limited to conditions created by the members of the chain found within the state. The conclusion is that the state must treat these stores as if they were something different from what they really are, since to do otherwise would be to reach beyond the borders of Louisiana for the measure of the tax. The argument answers itself. The policy Louisiana is free to adopt with respect to the business activities of her own citizens she may apply to the citizens of other states who conduct the same business within her borders, and this irrespective of whether the evils requiring regulation arise solely

from operations in Louisiana or are in part the result of extrastate transactions. It is not a denial of due process to adjust such license taxes as are here involved to meet the local evil resulting from business practices and superior economic power even though those advantages and that power are largely due to the fact that the taxpayer does business not only in Louisiana but in other states."

In their original brief the plaintiffs refer to the decision in Hartford Steam Boiler Inspection & Insurance Co. v. Harrison, 301 U.S. 459, 57 S.Ct. 838, 81 L.Ed. 1223, where it was held by a divided court upon petition and answer of the parties, and without evidence, that a Georgia statute, relating to insurance companies, was unconstitutional because it discriminated arbitrarily and unreasonably against stock companies by requiring them to write the policies through commission agents, while permitting mutual companies to write policies through salaried agents. But the plaintiff insurance companies in their brief pointed out that no evidence has been offered in the pending case to show that there is such a similarity between the various classes of insurance companies as makes it arbitrary to classify them differently, and hence the plaintiffs place no reliance upon the decision referred to, and make no attack upon the Virginia statute because its provisions apply to stock, casualty, insurance and surety companies, and the salaried agents thereof, but do not apply to life, title, ocean marine or mutual insurance companies or their salaried agents.

 The reference to mutual insurance companies in the Virginia Act is found in section 4222(a), where it is provided that no state agent, special agent, company representative, salaried officer, manager or other salaried representative of any legally authorized insurance company, except a mutual insurance company, shall countersign any contract of insurance or surety, covering persons or property within the state, except contracts of life, title and ocean marine insurance; and it may seem that this provision of the statute at least should be declared invalid. But we are satisfied that the injunction prayed should not on this account be granted. It was stated in paragraphs 9 and 11 of the complaint that the plaintiffs do not claim that any provision of the Virginia Act violates the rights of the company plaintiffs or of the agent plaintiffs, because it denies them the equal protection of the laws, except insofar as the Act is designed to promote the interests of the general body of the Virginia stock, fire, casualty and surety commission agents, with the view to unjustly enrich them at the expense of the salaried agents, the companies, the insuring public and the Commonwealth of Virginia. No evidence indicating unreasonable or arbitrary discrimination in favor of mutual companies has been submitted. On the other hand, the evidence shows that mutual companies, with immaterial exceptions, do not have commission agents, and the inclusion of such companies within the regulatory provisions of the statute would be meaningless unless they were required to operate on different principles. It is the boast of stock companies that the salaried agent of the mutual company is not able to afford as valuable a service to the insuring public as the commission agent of the stock company, since the latter is less the representative of the company, whose policies he places, than he is the representative of the insured. The plaintiffs "cannot complain if, in fact, the discrimination embodied in the law is but a perpetuation of a classification created and existing" by their own acts, Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 263, 56 S.Ct. 453, 456, 80 L.Ed. 669, and in fact they make no complaint in this respect.

Our conclusions of law are that the requirements imposed by the Act of 1938 upon the plaintiffs with regard to contracts of insurance made outside of Virginia are not beyond the jurisdiction of the state; that the provisions of the Act are not arbitrary and unreasonable or in violation of the federal Constitution, and that the prayers for interlocutory and permanent injunctions should be denied and the bill of complaint should be dismissed.