OSBORN ET AL. *v.* OZLIN ET AL.

No. 592. Argued March 27, 1940.—Decided April 22, 1940.

---

*Mr. John Lord O'Brian,* with whom *Mr. Andrew D. Christian* was on the brief, for appellants.

*Mr. Abram P. Staples,* Attorney General of Virginia, for appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Appellants have challenged the validity of a Virginia statute regulating the insurance of Virginia risks and have brought this suit to enjoin state officers from enforcing

it. Its relevant provisions, copied in the margin,[1] forbid contracts of insurance or surety by companies authorized to do business within that Commonwealth "except through regularly constituted and registered resident agents or agencies of such companies." § 4222, c. 218, Acts of 1938. Such resident agents "shall be entitled to and shall receive the usual and customary commissions allowed on such contracts," and may not share more than half of this commission with a non-resident broker. § 4226-a. Disobedience of these provisions (from which life, title and marine companies are exempted) may entail a fine or revocation of the corporate license in Virginia, or both. A district court of three judges, convened under § 266 of the Judicial Code as amended, 28 U. S. C. § 380, dismissed appellants' bill on the basis of elaborate findings of fact and conclusions of law, set forth in an opinion by Circuit Judge Soper. 29 F. Supp. 71. From this

---

[1] The relevant portions of the Virginia statute are as follows: "Section 4222. . . . (a) Insurance companies, legally authorized to do business in this State, except life, title and ocean marine insurance companies, shall not make contracts of insurance or surety on persons or property herein, except through regularly constituted and registered resident agents or agencies of such companies; no contract of insurance or surety covering persons or property in this State, except contracts of life, title and ocean marine insurance and except temporary binders covering other forms of insurance shall be written, issued or delivered by any such authorized insurance company, or any of its representatives, unless such contract is duly countersigned in writing by a resident agent or agency of such company; provided, however, that the countersignature of an insurance agency shall not be considered valid unless such countersignature be attested to in writing by a regularly constituted and registered resident agent of such company.

"No State agent, special agent, company representative, salaried officer, manager or other salaried representative of any legally authorized insurance company, except a mutual insurance company, shall countersign any contract of insurance or surety, or any renewal thereof, covering persons or property in this State, except contracts of life, title and ocean marine insurance; provided that this section

decree the case comes here on appeal under § 238 of the Judicial Code as amended, 28 U. S. C. § 345.

The bill was brought by foreign corporations authorized to do casualty and surety business in Virginia, and by some of their salaried employees. It is their claim that the statute deprives them of rights protected by the Fourteenth Amendment of the Constitution. The exact nature of these claims will appear more clearly in the setting of the illuminating findings below which may here be abbreviated.

The "production" of insurance—"production" being insurance jargon for obtaining business—is, in the main, carried on by two groups, agents and brokers. Though both are paid by commission, the different ways in which the two groups perform their functions have important practical consequences in the conduct of the insurance business, and hence in its regulation. The agent is tied to

shall not apply to railroad companies and other common carriers engaged in interstate commerce.

.        .        .        .        .

"Section 4226-a. . . . No resident agent or agency may write, countersign, issue or deliver any contract of insurance or surety upon persons or property in this State unless there shall be collected at the time the contract is written, issued or delivered, or within a reasonable time thereafter, the full premium on such contract, and the resident agent or agency shall be entitled to and shall receive the usual and customary commissions allowed on such contracts, provided that such resident agent or agency may write such contracts at the request only of such other resident agents or agencies, when such agent or agencies are properly licensed to transact the class of business involved in such exchange, and licensed non-resident insurance brokers who may be authorized by law to broker such contracts, and on exchange of business between resident agents or agencies in Virginia and licensed non-resident insurance brokers in other states the resident agent or agency in Virginia may allow or pay to such licensed non-resident insurance brokers, a commission not exceeding fifty per centum of the resident agent's or agency's commission allowed on such business."

his company. But his ability to "produce" business depends upon the confidence of the community in him. He must therefore cultivate the good will and sense of dependence of his clients. He may finance the payment of premiums; he frequently assists in the filing and prosecution of claims; he acts as mediator between insurer and assured in the diverse situations which arise. The broker, on the other hand, is an independent middleman, not tied to a particular company. He meets more specially the needs of large customers, using their concentrated bargaining power to obtain the most favorable terms from competing companies. His activities, being largely confined to the big commercial centers, take place mostly outside Virginia.

A policy, whether "produced" by broker or agent, must be "serviced"—an insurance term for assistance rendered a customer in minimizing his risks. To this end the companies exert themselves directly, but the "producer" may render additional service. Only to a limited extent can risks be minimized at long range; local activity is essential. When the contract is "produced" by a non-resident broker the "servicing" function is normally performed by the company exclusively. When the "producer" is a resident agent, the case is ordinarily otherwise. For this, as well as for other reasons, it is obvious that non-resident brokers prefer to negotiate their contracts covering Virginia risks with companies authorized to do business in that Commonwealth.

These basic elements in the insurance business attain special significance in the case of enterprises operating not only in Virginia but in other states as well. For them the brokerage system offers the attractions of large-scale production. Through what is known as a master or "hotchpotch" policy, the assured may obtain a cheaper rate by pooling all his risks, whether in or out of Virginia. This wholesale insurance may furnish not only a reduced rate

but a reduced commission to the customer. These are advantages which naturally draw the Virginia business of interstate enterprises away from local agents in Virginia to the great insurance centers.

In affecting the cost of these master policies, say the appellants, Virginia is intruding upon business transactions beyond its borders. Not only is a licensed company forbidden to write insurance except through a resident agent, but the agent cannot retain less than one-half of the customary commission allowed on such a contract for what may, so far as the requirements of the law are concerned, be no more than the perfunctory service of countersigning the policy.

But the question is not whether what Virginia has done will restrict appellants' freedom of action outside Virginia by subjecting the exercise of such freedom to financial burdens. The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids. *Alaska Packers Assn.* v. *Comm'n,* 294 U. S. 532; *Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 U. S. 412. Compare *Equitable Life Society* v. *Pennsylvania,* 238 U. S. 143. It is equally immaterial that such state action may run counter to the economic wisdom either of Adam Smith or of J. Maynard Keynes, or may be ultimately mischievous even from the point of view of avowed state policy. Our inquiry must be much narrower. It is whether Virginia has taken hold of a matter within her power, or has reached beyond her borders to regulate a subject which was none of her concern because the Constitution has placed control elsewhere. Compare *Wallace* v. *Hines,* 253 U. S. 66, 69.

Virginia has not sought to prohibit the making of contracts beyond her borders. She merely claims that her interest in the risks which these contracts are designed to prevent warrants the kind of control she has here

imposed.   This legislation is not to be judged by abstracting an isolated contract written in New York from the organic whole of the insurance business, the effect of that business on Virginia, and Virginia's regulation of it.

A network of legislation controls the surety and casualty business in Virginia.   Insolvent companies may not engage in it.   Virginia Code, § 4180.   Neither companies nor agents may give rebates.    § 4222–c.   Rates for workmen's compensation, automobile liability and surety contracts are determined by its Corporation Commission.   §§ 1887 (75), 4326–a–1, 4350–3.   The difficulty of enforcing these regulations, so the District Court found, may be increased if policies covering Virginia risks are "produced" without participation by responsible local agents.   Rebates evading local restriction may be granted under cover of business done outside the state.   Contrariwise, if resident Virginia agents are made necessary conduits for insurance on Virginia risks now included in master policies, the state may have better means of acquiring accurate information for the effectuation of measures which it deems protective of its interests.[2]

---

[2] Where out-of-state "production" actually leads to rebating in defiance of § 4222–c, there would seem little doubt of a substantial basis for Virginia's contention that the requirement of participation by a resident agent will make the illegal practices more susceptible of detection and control.  Cf. *La Tourette* v. *McMaster*, 248 U. S. 465.   Virginia has also contended that the master policy makes it possible for the companies to reduce their rates below the requirements of state law, and to attribute the reductions to risks in other states with requirements less stringent than those of Virginia.   Appellants strenuously contend that no law of Virginia prohibits the reduction of rates for out-of-state risks to compensate for the higher rates which might be required by Virginia and, therefore, there is no illegal practice in this connection which the existence of a resident agent could aid in uncovering.   This argument, if met on the merits, would lead us into the particularities of Virginia's rate laws.   It is enough to say that even if these practices are not illegal, Virginia

It is claimed that the requirement that not less than one-half of the customary commission be retained by the resident agent is a bald exaction for what may be no more than the perfunctory service of countersigning policies. The short answer to this is that the state may rely on this exaction as a mode of assuring the active use of resident agents for procuring and "servicing" policies covering Virginia risks. These functions, when adequately performed, benefit not only the company, the producer, and the assured. By minimizing the risks of casualty and loss, they redound in a pervasive way to the benefit of the community.[3] At least Virginia may so have believed. And she may also have concluded that an agency system, such as this legislation was designed to promote, is better calculated to further these desirable ends than other modes of "production." [4] When

may have a legitimate interest in discovering the extent of their prevalence in order to devise, if she so chooses, effective laws to prevent them.

[3] See Hardy, Risk and Risk-Bearing, pp. 9–28, 66–67; Kulp, Casualty Insurance, pp. 188–91, 467–68; Michelbacher, Casualty Insurance Principles, pp. 448–78, 583–84; Crobaugh and Redding, Casualty Insurance, pp. 17–20; Huebner, Foreword to Modern Insurance Tendencies, 157 Annals of the American Academy of Political and Social Science, pp. 3–4; Burns, Service of Casualty Insurance, 15th Annual Meeting, Chamber of Commerce of the United States, p. 4.

[4] "The broker is not required to render any technical service beyond the placing of business." Michelbacher, Casualty Insurance Principles, p. 403. Compare Id., pp. 401–402; Huebner, Property Insurance, pp. 81–96; Proceedings, 73rd Annual Meeting, National Board of Fire Underwriters, p. 123; Clark, Ellis and Fletcher, The Service of the Broker to the Assured in Liability Insurance, Howe Readings in Insurance, No. 18. But even if the broker does "service" the contract, his activities will take place in Virginia, and will affect the welfare of those inside Virginia who may be subject to the incidence of those risks which the "servicing" function tends to reduce. If this be true, it is Virginia's concern and not ours to prefer the agency to the brokerage method of "production."

these beliefs are emphasized by legislation embodying similar notions of policy in a dozen states,[5] it would savor of intolerance for us to suggest that a legislature could not constitutionally entertain the views which the legislation adopts. Compare *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530, 537.

The present case, therefore, is wholly unlike those instances in which a "so-called right is used as part of a scheme to accomplish a forbidden result." *Fidelity & Deposit Co.* v. *Tafoya,* 270 U. S. 426, 434. For it is clear that Virginia has a definable interest in the contracts she seeks to regulate and that what she has done is very different from the imposition of conditions upon appellants' privilege of engaging in local business which would bring within the orbit of state power matters unrelated to any local interests. It is not our province to measure the social advantage to Virginia of regulating the conduct of insurance companies within her borders insofar as it affects Virginia risks. Government has always had a special relation to insurance. The ways of safeguarding against the untoward manifestations of nature and other vicissitudes of life have long been withdrawn from the benefits and caprices of free competition.[6] The state may fix insurance rates, *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389; it may regulate the compensation of agents,

[5] Alabama Code, § 8379; Kansas, General Statute (Supp.), c. 40, § 246; Louisiana, Acts of 1918, No. 153; Maryland, Annotated Code, Art. 48A, § 65; Mississippi, Code, § 5205; Montana, Laws of 1937, c. 95; Oklahoma, Statutes Ann., Title 36, §§ 126, 142, 249; South Carolina, Code, § 7972; South Dakota, Code, § 31.2218; Washington, Rev. Statutes, § 7080; Wisconsin, Statutes, § 201.44; Wyoming, Rev. Statutes, c. 57, § 203.

[6] See Gephart, Principles of Insurance, pp. 233–55; Dawson, Insurance Legislation (1895); Abstract of the Laws of Virginia in Relation to Insurance Companies, etc., issued by the Auditor of Public Accounts (1878); Patterson, The Insurance Commissioner in the United States.

*O'Gorman & Young* v. *Hartford Fire Ins. Co.*, 282 U. S. 251; it may curtail drastically the area of free contract, *National Ins. Co.* v. *Wanberg*, 260 U. S. 71. States have controlled the expenses of insurance companies, New York Insurance Law, Consolidated Laws of New York, c. 28, § 244, and Wisconsin Statutes, § 201.21; and see Report of Joint (Armstrong) Insurance Investigation Committee (N. Y.) pp. 403–18 (1906). They have also promoted insurance through savings banks; see Berman, The Massachusetts System of Savings Bank Life Insurance, Bulletin No. 615, U. S. Bureau of Labor Statistics, and New York Laws of 1938, c. 471. In the light of all these exertions of state power it does not seem possible to doubt that the state could, if it chose, go into the insurance business, just as it can operate warehouses, flour mills, and other business ventures, *Green* v. *Frazier*, 253 U. S. 233, or might take "the whole business of banking under its control," *Noble State Bank* v. *Haskell*, 219 U. S. 104, 113. If the state, as to local risks, could thus preëmpt the field of insurance for itself, it may stay its intervention short of such a drastic step by insisting that its own residents shall have a share in devising and safeguarding protection against its local hazards. *La Tourette* v. *McMaster*, 248 U. S. 465. All these are questions of policy not for us to judge. For it can never be emphasized too much that one's own opinion as to the wisdom of a law must be wholly excluded when one is doing one's judicial duty. The limit of our inquiry is reached when we conclude that Virginia has exerted its powers as to matters within the bounds of her control.

In reaching this conclusion we have been duly mindful of the cases urged upon us by appellants. In *Allgeyer* v. *Louisiana*, 165 U. S. 578, apart from the doubts that have been cast upon the opinion in that case, the state attempted to penalize the making of contracts by its residents outside its borders with companies which had never subjected themselves to local control. Thus the statute

was thought to be directed not at the regulation of insurance within the state, but at the making of contracts without. This was followed in *St. Louis Compress Co.* v. *Arkansas*, 260 U. S. 346; but see the refined distinctions drawn in *Compañia de Tabacos* v. *Collector*, 275 U. S. 87. In *Fidelity & Deposit Co.* v. *Tafoya, supra*, the Court found that New Mexico had exceeded its power by forbidding "the payment of any emolument of any nature to any [non-resident] for the obtaining, placing or writing of any policy covering risks in New Mexico." The Court was of opinion that this statute went "beyond any legitimate interest of the State, . . ." *ibid.* at 435, but carefully withheld its judgment as to the validity of a later New Mexico statute not unlike the Virginia law here under review.[7]

The decree must be

*Affirmed.*

MR. JUSTICE ROBERTS, dissenting:

I am unable to agree with the decision in this case. I think it sanctions an exertion of power by Virginia over transactions beyond her jurisdiction.

---

[7] *Hartford Indemnity Co.* v. *Delta Co.*, 292 U. S. 143, resting on *Home Ins. Co.* v. *Dick*, 281 U. S. 397, held that the terms of a contract validly made in Tennessee could not be subsequently enlarged by Mississippi as to a condition of "substantial importance" when suit was later brought on the policy in Mississippi, simply because "the interest insured was in Mississippi when the obligation to indemnify . . . matured, and it was . . . [the company's] duty to make payment there." 292 U. S. at 149. At the time the contract was entered into Mississippi had no interest in the risk covered. The Court felt that, even at the time of suit, "performance at most involved only the casual payment of money in Mississippi," *ibid.* at 150, and that was an interest so subordinate to that of Tennessee that the latter was entitled to have the right of way. No question was thus involved touching the right of a state to regulate companies doing business within its borders as to contracts of insurance covering local risks.

Virginia may, of course, regulate the making of contracts of insurance within her borders. She may require such contracts to embody specified provisions. She may regulate the enforcement of these contracts in her courts. She may supervise and condition the activities of registered foreign insurance companies, agents or brokers within the Commonwealth. The statute in question has no such purpose.

The purpose and effect of the statute are to compel an insurance company which is a citizen of another state, and which negotiates a contract of insurance with an agent or broker within such other state, to pay a resident of Virginia for a service not rendered by him, but rendered by another in another state. By force of the statute a Virginia agent must countersign a contract negotiated outside of Virginia with an assured whose residence is outside of Virginia, which contract of insurance was negotiated by an agent or broker living outside of Virginia. The countersigning Virginia agent must be paid one-half the usual commission, even though the broker or agent who produced the business is licensed as a non-resident broker by Virginia, although the only service such Virginia agent is required to render and, in many cases all he does render, is the mere countersignature of the policy. With respect to this situation the court below said:

"We do not overlook the peculiar situation of the nonresident assured who form no part of the Virginia public which the state desires to protect. Undoubtedly their business methods will be disturbed by the enforcement of the statute. It is contended, not without merit, that they have no need for the services of the resident commission agents, and that in fact, the latter cannot assume the function of producing agents in their behalf without harmfully intruding themselves into confidential business affairs. Moreover, it is fair to say that these affairs are so important and so widespread in their scope as to be

beyond the technical knowledge and skill of the average Virginia agent, and that the interests of the non-resident assureds can be best looked after by the brokers at the great centers of population where the head offices of the insurance companies and of the assureds are located, and in Virginia by the engineering and claim personnel of the companies. It is also true that the substantial compensation required by the statute to be paid to the Virginia agents will increase the cost of the business."

The plain effort of Virginia is to compel a nonresident to pay a resident of Virginia for services which the latter does not in fact render and is not required to render. The principles underlying former decisions of this court are at war with the existence of any such asserted power.[1]

The CHIEF JUSTICE and MR. JUSTICE McREYNOLDS join in this opinion.

---

[1] *Allgeyer* v. *Louisiana*, 165 U. S. 578; *New York Life Ins. Co.* v. *Head*, 234 U. S. 149; *Aetna Life Ins. Co.* v. *Dunken*, 266 U. S. 389; *Fidelity & Deposit Co.* v. *Tafoya*, 270 U. S. 426; *Home Ins. Co.* v. *Dick*, 281 U. S. 397; *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.*, 292 U. S. 143; *Boseman* v. *Connecticut General Life Ins. Co.*, 301 U. S. 196