## STATE MUTUAL LIFE ASSURANCE COMPANY of America, Appellant.

v.

## STATE of Texas, Appellee.

### No. 10827.

Court of Civil Appeals of Texas.

Austin.

March 15, 1961.

Rehearing Denied April 12, 1961.

Dan Moody, Austin, Webster Atwell, Dallas, for appellant.

Will Wilson, Atty. Gen., Fred B. Werkenthin, C. Dean Davis, Asst. Attys. Gen., for appellee.

HUGHES, Justice.

The State of Texas filed this suit through its Attorney General at the request of the State Board of Insurance to cancel the license or certificate of authority under which appellant, State Mutual Life Assurance Company of America, does an insurance business in Texas, and for ancillary injunctive relief.

The basis of the State's case is that appellant has violated Art. 3.50 of the Insurance Code of Texas, V.A.T.S. by effecting

a contract of life insurance covering a group in Texas, which group is inadmissible under such statute.

Section 4 of Art. 3.50, I.C.T., provides:

"Except as may be provided in this article, it shall be unlawful to make a contract of life insurance covering a group in this State, and the license to do business in Texas of any company making a contract of life insurance covering a group in this State except as may be provided in this article may be forfeited by a suit brought for that purpose by the Attorney General of the State of Texas at the request of the Board of Insurance Commissioners."

The material facts were stipulated, and are:

Appellant is a Massachusetts Corporation, with head office in Worcester, Massachusetts. It writes all standard forms of ordinary and group life, individual and group accident and health insurance, and annuities and group credit on the annual dividend plan.

Appellant has had a permit to do an insurance business in Texas since 1935.

The National Association of Securities Dealers, Inc. (NASD) was incorporated under the laws of Delaware as a national securities association in July, 1939. It has offices in Delaware and Washington, D. C. It is the regulating instrument established under the Maloney Act, an amendment to the Securities Exchange Act of 1934 (Federal), 15 U.S.C.A. § 78a et seq. The obligations, responsibilities, authorities and powers of the Association primarily are concerned with the enforcement of ethical standards and practices of investment banking and securities businesses. As of November 30, 1958, NASD was comprised of 3870 firms in 49 States and the District of Columbia.

NASD solicited the services of an insurance counselor for the purpose of formulating a group life insurance plan for the benefit of its employees and the employees of its member firms. A suggested plan was approved by NASD, and after appellant had indicated a willingness to underwrite it, NASD entered into a declaration of trust for that purpose:

Under such Trust Agreement the Trustees thereof made applications on April 21, 1948, to appellant for group life insurance and group accident and health insurance, by sending such applications from the State of Delaware to the appellant's head office in Worcester, Massachusetts, where appellant accepted them and issued group policies on May 14, 1948, to be effective as of May 1, 1948. These policies were sent by mail by the appellant from Worcester, Massachusetts, to the Trustees of the trust in the State of Delaware.

As of November 30, 1958, there were 192 member firms of NASD in Texas. Of these, 25 Texas firms elected to participate in the group insurance plan.

All information and records pertaining to this group insurance plan are kept by the NASD trustees in Washington, D. C.

The member firms of NASD were advised in 1948 of the opportunity to participate in the insurance plan by a form letter of the Board of Governors of NASD. A booklet explaining the plan accompanied the form letter sent to the member firms, to whom were also sent an accounting and claims manual. A member firm elected coverage under the plan by sending to the Trustees a Notice of Participation.

The employees of those firms which elected coverage under the insurance plan sign a registration and record card, which constitutes a part of the records which the Trustees maintain. The employee furnishes his name, designates a beneficiary, and signs his part of the registration and record card, and the member employer sends these record cards back to the Trustees, who keep one-half and send the other half back to the member firms. Then the

Trustees notify the appellant by a premium notice each month of the total coverage. The appellant furnishes the blank certificate forms to the Trustees. The Trustees complete the certificates and send them directly to the member firms for delivery to the respective employees, inasmuch as all the information regarding the employees covered, ages, salaries, classification and beneficiary designation is with the Trustees and not with the appellant.

The premiums on the group policies are paid monthly by the Trustees from funds paid to them by the NASD and the member firms with respect to the employees employed by each. Each member firm is sent a monthly premium statement by the Trustees, and that member firm then sends a single check constituting the entire premium for the employees; this check is made payable to the "National Association of Securities Dealers, Inc. Insurance Trust." Along with the check is sent a monthly report of changes informing the Trustees of increases or decreases of that member firm under the plan. On receipt of the checks from the member firms, the Trustees transmit a single check monthly to appellant covering the entire plan. The Annual Verification Statement is completed by the Trustees and sent to each member firm, who signs and returns it when it finds such statement to be in accordance with its records.

Employees under the Plan may change their beneficiaries upon notification to the Trustees. Claim procedure is initiated by the member firm transmitting to the Trustees a Proof of Death form, along with either the Certificate or Form for Lost Certificate. The Proof of Death form includes an employer's statement and a physician's statement. After receipt of the above, the Trustees verify that the person filing the claim is a beneficiary under the policy and transmits this verification along with the claim to appellant. The beneficiary has a settlement option to be paid the entire sum or a series of monthly installments, and may exercise this option

upon notification to the Trustees. As a matter of practice, appellant then issues its check payable to the beneficiary named and sends it to the Trustees, who in turn send the check to the member firm for delivery to the beneficiary.

Since the Trustees keep and maintain all information and data, appellant does not know who are the employees covered nor the beneficiaries, until a Proof of Death form is filed with it. With the Proof of Death form, there is furnished the Certificate or Form of Lost Certificate and the beneficiary designation.

The coverage under the group plan conforms to established principles of group life insurance. The coverage is nonselective, full time employees being eligible without medical examination and without regard to age. It is mandatory that all eligible employees be covered, eligibility being limited only in that the employee be actively working for the member firm; the definition of "employees" is all-inclusive, encompassing actively employed officers, partners and proprietors. The policy is wholly noncontributory, providing that the member firm or "employer" pay all premiums for the employees.

This policy was valid under the laws of Delaware, Massachusetts and the District of Columbia.

Appellant's first and major contention is that under the facts, which we have stated, the Texas statutes do not proscribe the life insurance effected by it covering residents of this State, and hence the punishment of ouster inflicted upon it under Sec. 4, Art. 3.50, supra, was not authorized. The appraisal of this contention requires a careful consideration of the relevant statutes and related problems.

■ The penalty of forfeiture of the license of an insurance company to do business in this State is most severe. Its imposition will not be sustained unless the legal authority therefor is clear and unequivocal, and this is to be ascertained

by a strict construction of the statutes. Eubanks v. State, (Austin Tex.Civ.App.) 203 S.W.2d 339, writ ref. See also Board of Ins. Commissioners v. Great Southern Life Ins. Co., 150 Tex. 258, 239 S.W.2d 803, 809, where the Court in construing former Art. 4764a, Vernon's Ann.Civ.St., substantially the same for our purposes here as present Art. 3.50 of the Insurance Code, stated that this statute is both remedial and penal, and while construing it liberally in that case since enforcement of the forfeiture provisions was not sought quoted with apparent approval from 59 C.J., p. 1121 to the effect that such a statute " * * * should be considered as a penal statute when it is sought to enforce the penalty. * * *" See also 82 C.J.S. Statutes § 390. To the same effect is Howard v. Simons, Tex.Civ.App., Dallas, 285 S.W.2d 478, writ ref., N.R.E.

Art. 3.50 provides that "No policy of group life insurance shall be delivered in this State unless it conforms to one of the following descriptions: * * *"

There are then defined in the statute four policies of group life insurance which are permissible under the terms and conditions there stated. The first of these policies is defined to be:

"(1) A policy issued to an employer, or to the trustees of a fund established by an employer, which employer or trustees shall be deemed the policyholder, to insure employees of the employer for the benefit of persons other than the employer, subject to the following requirements:" [1]

Although appellant has a point to the effect that Texas members of a multiple-employer association, such as the NASD, constitutes an eligible group for group life insurance under the above definition, we do not find this point supported by argument. Appellant seemingly concedes that NASD is not a permissible group under Art. 3.50, when it states:

"The only claim which appellee makes in this case is that appellant has violated Article 3.50 by writing a group life insurance policy which is not issued to a single employer, but instead to an association of employers. In other words, the complaint is that since the group insured by the appellant is a multiple-employer group and not one of the permissible groups under Article 3.50 that appellant has violated that article and has consequently subjected its license to do business in the state to the penalty of revocation."

In any event, we hold that Art. 3.50 does not authorize the type of group insurance issued by appellant in this case.

Returning to the major question presented by appellant, which appellee phrases in these words: "Does the Texas Group Life Insurance Law (Art. 3.50) prohibit the contract in question insofar as it extends to Texas citizens?" we quote other pertinent portions of the statute:

"Sec. 2. Group Life Insurance Standard Provision.—No policy of group life insurance shall be issued or delivered in this State unless and until a copy of the form thereof has been filed with the Board of Insurance Commissioners of the State of Texas and formally approved by such Board, nor shall any policy of group life insurance be delivered in this State unless it contains in substance the following provisions, * * *"

From the language of this provision (Sec. 2) that "No policy of group life insurance shall be issued or delivered in this State," and the language of previously quoted Sec. 1, of Art. 3.50, that "No policy of group life insurance shall be delivered in this State," appellant persuasively argues that since it did not, under the facts, issue or deliver in this State any policy of group life insurance, it has not and could not have

---

1. The definitions of the other three permissible group policies are not helpful here, and are omitted.

violated Art. 3.50. Two questions are thus presented for our decision: (1) Adhering to our holding that the policy issued by appellant was not a permitted one under Art. 3.50, was such policy issued or delivered in this State? (2) Does Art. 3.50 require, before the penalty of forfeiture of appellant's license to do business in this State is authorized, the policy to have been issued or delivered in this State?

It seems to be undenied that the group insurance policy issued by appellant was not issued or delivered in this State.

To meet this factual deterrent, the State relies, in addition to the controlling effect it gives Sec. 4, Art. 3.50, upon Art. 21.42, Texas Insurance Code, formerly Art. 5054, R.C.S., 1925, to make appellant and its present conduct amenable to Art. 3.50. We quote Art. 21.42:

"Art. 21.42. Texas Laws Govern Policies

"Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same."

Since appellant does an insurance business in Texas, and if it has made a contract of insurance within the meaning of Art. 21.42, then, under such statute, the transaction is controlled by Art. 3.50, and appellant has violated it by insuring a non-permissible group.

The group policy issued by appellant to NASD contains these provisions:

"Individual Certificate. The Company will furnish to the Employer for delivery to each insured employee, an individual certificate showing the insurance protection to which the employee is entitled; to whom the proceeds are payable, and the conversion privileges.

"Entire Contract. This policy and the application of the Employer, a copy of which is attached to and made a part of this policy, and the application of the employees, if any, shall constitute the entire contract between the parties. All statements made by the Employer or by the individual employees or on their behalf shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall be used in defense to a claim under this policy unless it is contained in a written application.

"The rights of the Employer or any Employee or Beneficiary shall not be affected by any provisions other than one contained in the policies or the riders or endorsements thereon or in the amendments thereto, signed by the Employer and the Company, or in copies of the application of the Employer attached to the policy, or in the individual application of the employees, if any."

The certificates sent to the Texas employees contained these provisions:

"This is to certify that the employee named above is insured in accordance with and subject to the provisions and conditions of the above numbered policies, a summary of which provisions and conditions is set forth on the following pages: * * *

"Payment of Benefits. Upon due proof of the death of the employee while insured under the policy, the company will pay to the employee's beneficiary, the amount of insurance in force on his life as determined in accordance with the plan of insurance

in the policy, a summary of which is set forth on page 1 hereof * * *

"Conversion Privilege: Any insured employee while the policy is in force, may upon written application and payment of premium to the company within thirty-one days after termination of his employment for any reason whatsoever, have the company issue to him without evidence of insurability, any policy of life insurance only which is then being currrently issued by the company, except term insurance, in an amount not greater than the amount of the employee's life insurance under the policy at the time of such termination * * *

"Termination of Insurance: The insurance in force on any employee shall automatically terminate when his employment with the employer shall terminate; * * *"

These employees . made no application for insurance, and the only application attached to the policy issued by appellant is the application of the Trustees of the participating employer members of NASD.

The trial court made this finding:

"A contract of insurance exists between defendant State Mutual Life Assurance Company of America and each Texas Employee of a participating member-employer of the National Association of Securities Dealers, which has elected to participate in the group life insurance plan of the association."

The material facts are not disputed and whether or not a contract of insurance was made by appellant with the Texas employees is, we believe, a question of law.

In addition to the certificates sent the Texas employees, the State points to the following facts or circumstances to substantiate the finding or conclusion of the Trial Court:

"(1) The NASD executed a trustee agreement with three (3) trustees, authorizing them to procure group life insurance from appellant for the benefit of members of NASD and their employees. At the present time 198 Texas lives come within that category.

"(2) The trustees did in fact cause a group life policy to be issued, which recited that appellant does 'insure certain employees of participating employer-members of the National Association of Securities Dealers, Inc., Insurance Trust under the following conditions: * * *'

"(3) The master policy establishes the procedure whereby a Texas employee became insured, both as to those employees eligible on the effective date of the master policy and employees eligible after the effective date.

"(4) Those Texas member-employers of NASD desiring to be covered under the contract had to submit a 'notice of participation' which requested that 'all our full-time employees be insured subject to the terms of group insurance policies issued by the State Mutual Life Assurance Company of Worcester, Massachusetts, and to the agreements between the Trustees and the National Association of Securities Dealers, Inc. * * *'

"(5) Appellant prepared a 'manual of accounting and claim procedure' for the insurance plan which detailed, for Texas member-employers, the procedure for becoming insured under the plan of insurance offered by appellant.

"(6) Before any insurance was effective, both Texas employer-members and employees had to complete a 'registration card' which contained the following: 'the above information is presented by me for the purpose of becoming insured under and subject to the terms and conditions of group life insurance policy GL–351 and

Group Accident and Death and Dismemberment Policy GDD–351 issued to the National Association of Securities Dealers, Inc. by the State Mutual Life Assurance Company of Worcester, Mass. The entire cost of this insurance to be paid by my employer."

In Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 689, 81 L.Ed 1036, the Court, in deciding a similar question, stated:

"Petitioner insists that the delivery of the certificate in Texas made the law of that State, Art. 5546, applicable. But the certificate is not a part of the contract of, or necessary to, the insurance. It is not included among the documents declared 'to constitute the entire contract of insurance.' Petitioner was insured on the taking effect of the policy long before the issue of the certificate. It did not affect any of the terms of the policy. It was issued to the end that the insured employee should have the insurer's statement of specified facts in respect of protection to which he had become entitled under the policy. It served merely as evidence of the insurance of the employee. Petitioner's rights and respondent's liability would have been the same if the policy had not provided for issue of the certificate. And plainly delivery of the certificate by the refining company to petitioner in Texas has no bearing upon the question whether Pennsylvania law or Texas law governs in respect of the notice of claim. We are unable to agree with decisions of the Court of Civil Appeals of Texas in cases similar to this that the certificate is a part of the contract of insurance or that its delivery is necessary to make the policy effective. * * *

" * * * Employers regard group insurance not only as protection at low cost for their employees but also as advantageous to themselves in that it makes for loyalty, lessens turn-over and the like. When procuring the policy, obtaining applications of employees, taking payroll deduction orders, reporting changes in the insured group, paying premiums, and, generally, in doing whatever may serve to obtain and keep the insurance in force, employers act not as agents of the insurer but for their employees or for themselves."

Regarding Art. 5054, present Art. 21.42, the Court said:

"Article 5054 applies only to contracts of insurance made by an insurance company doing business in Texas."

The holding of the Court in Boseman was that the law of Texas did not apply to the contract of insurance in suit.

The decision in Boseman was applied in Metropolitan Life Ins. Co. v. Wann, the history of which we will briefly review.

The first Appellate Court decision in this litigation is by the Fort Worth Court of Civil Appeals, 28 S.W.2d 196, 197. There suit was brought to recover under a group insurance policy. The group policy was not introduced in evidence, but introduced in evidence were certificates issued to each insured employee, evidencing the fact that they were insured. The Court held these certificates were the equivalent of individual policies showing "a complete contract between the insurer and the insured to insure the individual employee * * *."

This case was reversed by the Commission of Appeals, 41 S.W.2d 50, the Court holding that the certificates alone did not establish a complete contract of insurance.

On retrial, the Insurance Company lost again, and this judgment was affirmed by the Court of Civil Appeals, 81 S.W.2d 298. The group policy was introduced thus eliminating the cause of the previous reversal. The question of attorney's fees arose and the Court held that they were recoverable

under a Texas Statute even though the policy was issued in New York where the company had its principal office, a State which did not authorize recovery of attorney's fees in such case, the Court holding the attorney's fee statute applicable under Art. 5054, now Art. 21.42. This holding was reversed by the Commission of Appeals in obedience to the decision of the Supreme Court of the United States in Boseman, 130 Tex. 400, 109 S.W.2d 470, 472. The Texas Supreme Court saying, in reference to Boseman:

"In deference thereto, we hold that the policy provisions are governed by the laws of New York and not by the laws of Texas, unless it be established upon another trial that at the time the group policy was issued the plaintiff in error was doing business in this state. This record contains no proof of that fact, but, as the question was not developed one way or the other upon the trial the case will be remanded for another trial." [2]

Appellant states that the "great weight" of authority follows the rule of decision in the Wann case and holds that even where the employees contributed to the payment of premiums for the group insurance, as in Wann, the certificates issued to them do not constitute the contract of insurance.

The cases cited by appellant are set out below.[3]

We need not explore the validity of this assertion.

As to group insurance policies issued to an employer who pays the entire premium, as here, it has been authoritatively decided in Texas that the certificate issued to the noncontributing employees was no part of the contract of insurance. Connecticut General Life Insurance Co. v. Moore, Tex.Civ.App. Beaumont, 75 S.W.2d 329, writ dism.

We find the general rule to be stated in American Jurisprudence, Vol. 29, p. 835, as follows:

"When group insurance is effected, a group or 'master' policy is customarily issued to employer or analogous policyholder and certificates of participation are issued to the individual employees or participants. It is generally held that an employee's contract of insurance under the group plan consists of the policy issued by the insurer to the employer, the individual certificates delivered by the employer to the employee being no part of such contract, but only an instrument reciting the employee's rights to protection under the terms of the group policy, so long as there is a compliance with the conditions of the policy."

and in 44 C.J.S. Insurance § 299, p. 1203, as follows:

"The employees' certificate, on the other hand, ordinarily is not the contract of insurance, or a part thereof, and cannot be relied on as creating contractual rights. It is merely a statement or evidence of the certificate hold-

---

2. One of the Texas cases which the United States Supreme Court expressly refused to follow in Boseman was Metropolitan Life Ins. Co. v. Worton, Tex.Civ.App., 70 S.W.2d 216, writ ref., in which it appeared that the insurance company had a permit to do business in Texas.

3. Connecticut General Life Ins. Co. v. Speer, 1932, 185 Ark. 615, 48 S.W.2d 553; Collier v. Metropolitan Life Ins. Co., D.C.D.C.1949, 82 F.Supp. 529; Kimbal v. Travelers Ins. Co., 1942, 151

Fla. 786, 10 So.2d 728; Adair v. General American Life Ins. Co., Mo.App. 1939, 124 S.W.2d 657; Seavers v. Metropolitan Life Ins. Co., 1928, 132 Misc. 719, 236 N.Y.S. 366; King v. Sperry Gyroscope Co. et al., Sup.1945, 57 N.Y.S. 2d 684; Davis v. Metropolitan Life Ins. Co., 1930, 161 Tenn. 655, 32 S.W.2d 1034; Fisher v. United States Life Ins. Co., 4 Cir., 1957, 249 F.2d 879. Cf. Duval v. Metropolitan Life Ins. Co., 1927, 82 N.H. 543, 136 A. 400, 50 A.L.R. 1276; Provident Life & Accident Ins. Co. v. Nicholson, 1931, 157 Va. 345, 160 S.E. 5.

er's coverage by the master policy, and by accepting the contract he is bound by its terms as entered into between the contracting parties."

It has also been held that Art. 5054, now Art. 21.42, is not activated solely by the fact that the foreign insurance company has a license to do an insurance business in this State and does such business when the subject contract of insurance is not executed or delivered in this State. We quote from Washington Nat. Ins. Co. v. Shaw, Tex.Civ.App. Waco, 180 S.W.2d 1003, 1004 writ dism.:

"It will be observed that no part of the transaction leading up to the consummation of the original contract, or to the reinstatement thereof, or to the maturity of any right accruing thereunder, occurred or transpired within the State of Texas. Under the terms of the policy the insured was given the right to have the beneficiary changed at any time upon request, irrespective of the place of residence of such beneficiary. Clearly, the contract was not in fact made or entered into with reference to the laws of Texas or because of any Texas license or permit issued to appellant. Consequently, we do not think the provisions of Art. 5054 of Vernon's Tex.Civ.Stats. require or authorize the courts to hold that the contract sued upon was in legal contemplation made and entered into under and by virtue of the laws of Texas relating to insurance merely because appellant was in fact doing other business as an insurance company within this state, even though the proceeds from the policy were to become payable to some person whose residence might be within this state."

The State, here, relies on the decisions of the Supreme Court in Great Southern, supra, and in International Brotherhood of Boilermakers, Iron Shipbuilders, and Helpers of America v. Huval, 140 Tex. 21, 166 S.W.2d 107, 112.

A more able opinion or sound decision than the one written by now Chief Justice Calvert for the Court in Great Southern could not be found. Unfortunately, for us, it is not in point here. The only questions there decided were that a contract, or contracts, made in Texas violated a Texas statute, and that the statute was valid.

Huval is more difficult of explanation. If it stands for the rule that because a foreign corporation does business in this State, its activities elsewhere can be regulated by this State,[4] it runs afoul of our recent decision in State Board of Insurance v. Todd Shipyards Corp., Tex.Civ.App., 340 S.W.2d 339, writ ref. N.R.E., per curiam opinion Tex., 243 S.W.2d 241, where we followed St. Louis Cotton Compress Co. v. State of Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297, in holding that "It is true that the State may regulate the activities of foreign corporations within the State, but it cannot regulate or interfere with what they do outside."

Huval is distinguishable from our case as shown by its statement on rehearing that

4. That this was the basis of the Court's opinion is shown by the following excerpt from the opinion in that case:
"This case is distinguishable from the case of Boseman v. Connecticut General Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036, 110 A.L.R. 732. In that case the insurance company was not doing business in Texas at the time it entered into the contract. The contrary is true in this instance. In the case of Metropolitan Life Ins. Co. v. Wann, 130 Texas 400, 109 S.W. (2d) 470, 115 A.L.R. 1301, this Court had under consideration a group policy issued in the State of New York by a New York corporation, and the question arose as to whether it would be governed by the laws of Texas under and by virtue of the provisions of Article 5054. This Court remanded the cause to the trial court for new trial to ascertain whether or not the company issuing the policy was doing business in Texas at the time it entered into the contract, it being held that if it was so doing business in Texas at that time, the contract would be governed by the laws of Texas."

[140 Tex. 21, 166 S.W.2d 112] "A State may lawfully limit or prohibit the making of certain contracts between citizens of such State." The contract here was not between citizens of this State.

As correctly reflecting our understanding of group insurance as applied to the facts here we quote from Vol. 29A, American Jurisprudence, p. 833:

> "Generally speaking, group insurance is the coverage of a number of individuals by means of a single or blanket policy, thereby effecting economies which frequently enable the insurer to sell its services at lower premium rates than ordinarily obtainable for the same type of insurance protection on life policies sold to individuals. Group insurance ordinarily takes the form of insurance whereby the employees' lives are insured by the employer in consideration of a flat premium based upon the average age; the premiums are generally paid by the employer either wholly or partially so long as the employee remains in the employment and the premuims are paid. Such contracts are generally construed as creating a contract for insurance between employer and insurer but for the benefit of the insured employees. To a like effect, it has been said that a group life insurance contract is made by the insurer and employer, rather than between the insurer and the employees covered thereunder, and affects four parties—the insurer, the employer, the insured and the beneficiary."

If we construe Art. 3.50 and apply Art. 21.42 as the State would have us do, we believe the Articles, as applied here, would be of doubtful constitutionality.

■ A State may arbitrarily refuse to admit foreign corporations, or it may license them upon any terms it sees fit, "apart from exacting surrender of rights derived from the Constitution of the United States." Wheeling Steel Corporation v. Glander, 337 U.S. 562, 69 S.Ct. 1291, 1296, 93 L.Ed. 1544.

■ The protections of the Fourteenth Amendment to the United States Constitution are available to a corporation. See authorities cited in concurring opinion by Mr. Justice Jackson in Wheeling v. Glander, supra.

This amendment provides in part that no person should be deprived of his liberty without due process of law. "Liberty" has been defined in Allgeyer v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 431, 41 L.Ed. 832, as follows:

> "The 'liberty' mentioned in that amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned."

■ This freedom, here the freedom to make a contract lawful where consummated, cannot be denied appellant under the guise of regulating a foreign corporation doing business in this State, because to do so attributes to our statutes, 3.50 and 21.42, extraterritorial effect, which may not constitutionally be done. This was the question decided in New York L. Ins. Co. v. Head, 234 U.S. 149, 34 S.Ct. 879, 883, 58 L.Ed. 1259, from which we quote:

> "It is true it has been held that, in view of the power of a state over insurance, it might, as the condition of a license given to a foreign insurance company to do business within its borders, impose a condition as to business within the state, which otherwise, but for the complete power to exclude, would be held repugnant to the Consti-

tution. In other words, that a company having otherwise no right whatever, for any purpose, to go in without a license, would not be heard, after accepting the same, to complain of exactions upon which the license was conditioned as unconstitutional, because of its voluntary submission to the same. But even if it be put out of view that this doctrine has been either expressly or by necessary implication overruled, or, at all events, so restricted as to deprive it of all application to this case (see Harrison v. St. Louis & S. F. R. Co., 232 U.S. 318, 332, ante, 621, 626, 34 Sup.Ct.Rep. 333, 58 L.Ed. 621, and authorities there cited), it here can have no possible application since such doctrine, at best, but recognized the power of a state, under the circumstances stated, to impose conditions upon the right to do the business embraced by the license, and therefore gives no support to the contention here presented, which is that a state, by a license, may acquire the right to exert an authority beyond its borders which it cannot exercise consistently with the Constitution. But the Constitution and its limitations are the safeguards of all the states, preventing any and all of them, under the guise of license or otherwise, from exercising powers not possessed." [5]

The State has furnished us with a copy of an opinion of Ohio's Attorney General which holds that an Ohio statute which makes it unlawful for an insurance company authorized to transact such business in Ohio to make a group life insurance contract covering a group in Ohio unless the group was permissible under Ohio law, even though the contract or policy involved was applied for and delivered in another State.

The Attorney General followed an analogous decision by the Supreme Court of Ohio in State ex rel. European Accident Insurance Co. v. Tomlinson, 101 Ohio St. 459, 129 N.E. 684, 685. The Court was quoted as follows:

"* * * Since the making of contracts for reinsurance is conceded, the fact that such contracts were made in a foreign state by an alien company with other companies actually admitted to make liability insurance in Ohio does not remove the ban of the statute, for the quoted section applies to all companies whether organized in this state or elsewhere.

"We do not have the situation arising in the reported case of Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. If it be conceded that the state might not interfere with an insurance contract made in a foreign state by a foreign company, non constat that the state may not impose conditions under which such foreign or alien company may be permitted to do insurance business in Ohio. * * * There is no inherent right for license existing in favor of the relator. That is granted by favor of the state and only upon conditions which the state imposes."

Also cited by the Ohio Attorney General was Palmetto Fire Ins. Co. v. Conn., and other consolidated causes, 272 U.S. 295, 47 S.Ct. 88, 71 L.Ed. 243. In this case it was held that Ohio could regulate and tax insurance obtained by the purchasers of Chrysler cars in Ohio even though the con-

---

5. See Vol. 16A C.J.S. Constitutional Law § 575, where it is stated:
   "Extraterritorial transactions. The due process clause of the Fourteenth Amendment denies to any state the power to restrict or control the obligation of contracts executed and to be performed outside the state, notwithstanding one of the contracting parties and subject matter of the contract may be within the state."
   Also see Cooper Co. of Gainsville v. State, 187 Ga. 497, 1 S.E.2d 436, Connecticut Gen Life Ins. Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673.

tract of insurance was made in Michigan between a Michigan corporation and South Carolina insurance corporation, having a license to do business in Ohio.

It seems to us that this case presents no serious problem because the cost of the insurance was included in the cost of the car, and the car being purchased in Ohio so was the insurance, and Ohio's right to regulate and tax followed.

The Ohio Attorney General recognized that Allgeyer v. Louisiana, supra, indicated "a conclusion to the problem considered here different from that which would follow from the authorities cited previously." He states, however, that:

"The modern view governing the regulation of insurance contracts, regardless of situs, covering persons or property within another state has been expressed as follows by the United States Supreme Court in Hoopeston Canning Co. et al. v. Cullen, Superintendent of Ins., 318 U.S. 313, 316, 87 L.Ed. 777, 782, 63 S.Ct. 602:

" 'In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors. This interest may be measured by highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss. Alaska Packers Asso. v. Industrial Accident Commission, 294 U.S. 532, 542, 79 L.Ed. 1044, 1049, 55 S.Ct. 518. * * *'' **6**

If Arts. 3.50 and 21.42 are to be construed as the State contends, then the effect of this construction is that appellant and insurance companies similarly situated are prohibited from making contracts beyond the borders of this State insuring groups in this State the insuring of which is unlawful within this State, solely because such companies have been issued a license to engage in the insurance business in this State.

In Hartford Accident & Indemnity Co. v. Delta Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 636, 78 L.Ed. 1178, the Court stated:

"It is urged, however, that in this case the interest insured was in Mississippi when the obligation to indemnify the appellee matured, and it was appellant's duty to make payment there; and these facts justify the state in enlarging the appellant's obligation beyond that stipulated in the bond, to accord with local public policy. The liability was for the payment of money only, and was conditioned upon three events,—loss under the policy, notice to the appellant at its home office, and presentation of claim within fifteen months of the termination of the suretyship. All of these conditions were of substantial importance, all were lawful in Tennessee, and all go to the obligation of the contract. It is true the bond contemplated that the employee whose faithfulness was guaranteed might be in any state. He was in fact in Mississippi at the date of loss, as were both obligor and obligee. The contract being a Tennessee contract and lawful in that state, could Mississippi, without deprivation of due process, enlarge the appellant's obligations by reason of the state's alleged interest in the transaction? We think

---

6. Of similar import are Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 and Travelers Health Association v. Com. of Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154. In Osborn the

Court plainly stated: "Virginia has not sought to prohibit the making of contracts beyond her borders." [310 U.S. 53, 60 S.Ct. 761]

**338** ■ ■

not. Conceding that ordinarily a state may prohibit performance within its borders even of a contract validly made elsewhere, if the performance would violate its laws (Home Insurance Co. v. Dick, supra, page 408 of 281 U.S., 50 S.Ct. 338, 74 L.Ed. 926 * * *), it may not on grounds of policy ignore a right which has lawfully vested elsewhere if, as here, the interest of the forum has but slight connection with the substance of the contract obligations. Here performance at most involved only the casual payment of money in Mississippi. In such a case the question ought to be regarded as a domestic one to be settled by the law of the state where the contract was made. A legislative policy which attempts to draw to the state of the forum control over the obligations of contracts elsewhere validly consummated and to convert them for all purposes into contracts of the forum, regardless of the relative importance of the interests of the forum as contrasted with those created at the place of the contract, conflicts with the guaranties of the Fourteenth Amendment."

This case was followed in Sun Insurance Office Limited v. Clay, 265 F.2d 522, 525, Fifth Circuit, where the court refused to apply a Florida statute (F.S.A. § 95.03) which the court stated was "quite general and broad, and it appears to apply to all contracts, wherever made or performed" to an insurance policy made in Illinois even though the property insured was in Florida at the time of loss.

■ These cases lead us to believe that the mere fact that the insured reside in Texas and that the payment of money to a beneficiary, who may or may not reside in Texas, is the only obligation of the insurance contract to be performed in this State are probably not of sufficient local importance to justify the State in ousting appellant from Texas for having made it, beyond its borders, and lawful where made.

■ Liberally construing Art. 3.50, as we feel compelled to do, and bearing in mind the general rules of statutory construction that the Act as a whole must be looked to, and that specific provisions control more general provisions, and that the statute should not be construed so as to make its constitutionality doubtful and that the validity of the statute should be sustained if any reasonable construction can achieve it, we hold that Sec. 4 of Art. 3.50 does not control the activities of foreign insurance companies licensed to do and engaging in an insurance business in this State beyond the borders of this State, and that the specific provisions of the statute prohibiting the issuance or delivery in this State of certain policies of insurance are paramount to and control the more general wording of the penalty and enforcement provisions of Sec. 4 of Art. 3.50.

In accordance with these views, we reverse the judgment of the Trial Court by which it was decreed that:

"all charter, amendments, permits, licenses, certificates of authority, powers and privileges heretofore issued and granted to the Defendant, State Mutual Life Assurance Company of America, by any agency of the State of Texas be cancelled, revoked, forfeited, and annulled;"

and here render judgment that the State take nothing by its suit.

Reversed and rendered.