STATE OF TEXAS, Petitioner

V.

STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA, Respondent

No. A-8417.   Decided January 17, 1962
Rehearing Denied February 21, 1962
353 S.W. 2d 412

*Will Wilson*, Atty. Gen., *Fred B. Werkenthin* and *C. Dean Davis*, Assts. Atty. Gen., for petitioner.

*Dan Moody*, Austin, *Webster Atwell*, Dallas, for respondent.

CHIEF JUSTICE ROBERT W. CALVERT delivered the opinion of the Court.

Suit is by The State of Texas to cancel the license or certificate of authority of respondent to do business in this state. Cancellation is sought because of alleged violation of Sec. 4, Art. 3.50, Texas Insurance Code, in the making of contracts of insurance, unauthorized by Art. 3.50, "covering a group in this State".

The trial court ordered all permits, certificates of authority, etc., heretofore issued to respondent cancelled, but further provided in its judgment that the order of cancellation should not issue if, "after[1] thirty (30) days from the date" the judgment became final, or, in case of appeal, thirty days after mandate of affirmance was received from the appellate court, respondent should cancel and withdraw "all present coverage of group life insurance extended to Texas citizens who are members of the National Association of Securities Dealers". The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment that the State take nothing by its suit. 345 S.W. 2d 325.

State Mutual is a Massachusetts corporation with its home office in that state. It writes all standard forms of ordinary and group life, individual and group accident and health, and other types of insurance contracts. It has held a permit or certificate of authority to do business in this State since 1935, and since that time has engaged in the business in this State of selling contracts of life insurance, health and accident insurance, and annuities through agents maintained in this State. The National Association of Securities Dealers is incorporated under the laws

---

1. The court surely meant *within* rather than *after;* otherwise there would be no limitation of time.

of Delaware, as a national securities association. It has offices in Delaware and Washington, D. C. As of November 30, 1958, it was comprised of 3870 member firms in 49 states and the District of Columbia, with 192 member firms in Texas.

In 1948 National Association of Securities Dealers and certain named individuals, as Trustees, executed a Declaration of Trust by the terms of which an insurance trust was created for the purpose of effecting and administering a plan of group insurance, submitted and proposed by respondent, for NASD's member firms and their employees. The Trustees mailed applications for group life insurance and group accident and health insurance from NASD's office in Delaware to State Mutual's office in Massachusetts, where the applications were accepted and group policies were issued and mailed to the Trustees in Delaware. Twenty-five Texas member firms of NASD have applied for and received coverage under the group policies for their firm members and their employees. The group policies were, and are, valid under the laws of both Massachusetts and Delaware. They would not have been valid in Texas had they been executed and delivered in this State because Art. 3.50 does not authorize group insurance for members and employees of members of a trade association.[2]

Under the provisions of Section 1, Art. 3.50, Texas Insurance Code, group insurance may be written in Texas for only four groups: 1. For employers with, and insuring, 10 or more employees. 2. For labor unions insuring their members. 3. For independent school districts and other agencies, departments, etc., of the State government insuring their employees. 4. For creditors

---

2. Since the trial court's judgment was entered and was reversed by the Court of Civil Appeals, the Legislature has amended Art. 3.50 to authorize group insurance for trade association members and their employees with the limitation that "(f) No policy may be issued * * (ii) to insure employees of any employer which is not located in this state, unless the majority of the employers whose employees are to be insured are located in this state * * *." Acts 1961, 57th Leg., p. 563, Ch. 263, Sec. 1.

The parties were requested to file written statements indicating their opinions as to whether and to what extent the amendment affects the issues or the rights of the parties in this case. They have complied and are agreed that neither is substantially affected. Accordingly, we treat the case as though the amendment had not been enacted, but we are not to be understood as agreeing or disagreeing with the view of the parties.

The amendment raises these questions which may be relevant but which we do not decide. Is the limitation constitutional and valid? If it is not, can the remainder of the amendment be valid? If it is, could the court permit a judgment cancelling respondent's permit, but not yet final, to stand when the judgment is conditioned on the cancellation by respondent of group coverage now authorized in this state but unauthorized when written? These questions and any others raised by the amendment are put aside.

insuring their debtors. This court has held expressly that contracts insuring the employees of members of trade associations are unauthorized. Board of Ins. Com'rs. v. Great Southern Life Ins. Co., 150 Texas 258, 239 S.W. 2d 803.

■ But it is the contention of State Mutual that although the Texas statute may prohibit the execution or delivery in Texas of contracts of insurance covering trade association groups in Texas, the statute does not prohibit the coverage of trade association groups in Texas by contracts of insurance executed and delivered in states where that type of group insurance is legal. This contention is negated by the plain and unambiguous language of Sec. 4, Art. 3.50. The section reads:

"Except as may be provided in this Article, it shall be unlawful to make a contract of life insurance covering a group in this State, and the license to do business in Texas of any company making a contract of life insurance covering a group in this State except as may be provided in this article may be forfeited by a suit brought for that purpose by the Attorney General of the State of Texas at the request of the Board of Insurance Commissioners."

Moreover, to sustain State Mutual's contention would be to destroy the effectiveness of Art. 3.50 and to make a mockery of its purpose and intent. It is not suggested that State Mutual and NASD undertook to evade the requirements of Art. 3.50 by selecting states where insurance contracts covering trade association groups are lawful as the situs of their principal contractual activities. Obviously they did not do so. But the necessary net effect of sustaining the contention would be to send all parties wishing to effect non-conforming group coverage in Texas scurrying for states for contract execution where the contract would be lawful and valid. We reject respondent's contention and hold that Sec. 4 of Art. 3.50 authorizes cancellation of the license to do business in Texas of any company which executes and delivers anywhere a contract of insurance covering an unauthorized group in Texas, irrespective of the validity of the contract where executed and delivered.

Respondent asserts that construction and application of Art. 3.50 to the facts before us so as to authorize cancellation of its permit to do business in Texas violates the due process, full faith and credit, and commerce clauses of the United States Constitution. That contention must be rejected. Pertinent to our

consideration of the contention in addition to Art. 3.50 is that part of Art. 21.43, Texas Insurance Code which reads:

"The provisions of this code are conditions upon which foreign insurance corporations shall be permitted to do business within this state, and any such foreign corporation engaged in issuing contracts or policies within this state shall be held to have assented thereto as a condition precedent to its right to engage in such business within this state."

The problem posed is as to the power of The State of Texas to condition State Mutual's right to continue to do business in Texas on its cancellation of coverage as to groups in Texas of group insurance policies which are not authorized by Art. 3.50. With the problem thus stated it seems in order to observe that such cases as Allgeyer v. Louisiana, 165 U.S. 578, 17 S. Ct. 427, 41 L. Ed. 832, New York Life Ins. Co. v. Head, 234 U.S. 149, 34 S. Ct. 897, 58 L. Ed. 1259, St. Louis Compress Co. v. State of Arkansas, 260 U.S. 346, 43 S. Ct. 125, 67 L. Ed. 297, Hartford Accident and Indemnity Co. v. Delta Pine Land Co., 292 U.S. 143, 54 S. Ct. 634, 78 L. Ed. 1178, Boseman v. Conn. Gen. Life Ins. Co., 301 U.S. 196, 57 S. Ct. 686, 81 L. Ed. 1036, and State Board of Ins. v. Todd Shipyards Corp., Texas Civ. App., 340 S.W. 2d 339, writ refused, n.r.e., with per curiam opinion, 343 S.W. 2d 241, certiorari granted, 82 S. Ct. 40, cited by State Mutual, and Metropolitan Life Ins. Co. v. Wann, 130 Texas 400, 109 S.W. 2d 470, International Brotherhood of Boilermakers, etc. v. Huval, 140 Texas 21, 166 S.W. 2d 107, and Watson v. Employers Liability Assur. Corp., 348 U.S. 66, 75 S. Ct. 166, 99 L. Ed. 74, cited by the State, are not strictly apposite. None of them are cases which call into question the power of a state to refuse to grant a local permit to do business to a foreign insurer, or to cancel a granted permit, because of violation of, or failure or refusal to comply with, local regulations. These and other like decisions bear only indirectly on the problem before us. They are only important in determining what local regulations as applied to foreign insurance contracts impinge upon constitutional rights, and are relevant to the problem here, if at all, only because the granting or continuance of a local permit to do business may not be conditioned on compliance with unconstitutional regulations or on surrender of constitutional rights. Allgeyer v. Louisiana, St. Louis Compress Co. v. State of Arkansas and State Board of Ins. v. Todd Shipyards Corp. each involved an effort by a state to enforce a penalty or a tax in the nature of a penalty against a local citizen or corporation for making a contract of insurance in another state

with a foreign insurer not having a local permit to do business. All of the other cited cases involved efforts in suits on foreign contracts of insurance to enforce local statutory rights of the insured which, if enforced, would have had the effect of modifying contractual rights of the insurer which were valid in the state where the contract was made or was to be performed.

Somewhat more directly related to the problem as we have stated it are Osborn v. Ozlin, 310 U.S. 53, 60 S. Ct. 758, 84 L. Ed. 1074, and Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 63 S. Ct. 602, 87 L. Ed. 777, cited by the State. Osborn v. Ozlin was a suit to enjoin the enforcement of penalties, including revocation of the license of a corporation to do business in Virginia, because of failure to comply with statutes regulating the writing of certain types of insurance and the payment of commissions to agents in Virginia. Hoopeston Canning Co. v. Cullen was a declaratory judgment suit in which foreign reciprocal insurance companies sought a declaration that they were not required to comply with certain New York regulatory statutes as a condition to their right to do business in that state. In each of the cases the power of the state to require compliance with the local regulations as a condition to the right to do business in the state was upheld.

■ The specific problem confronting us has been considered by the Supreme Court of the United States in a number of cases. From them we may conclude, as did the Court in Washington ex. rel. Bond & Goodwin & Tucker v. Superior Court, 289 U.S. 361, 53 S. Ct. 624, 77 L. Ed. 1256, 89 A.L.R. 653, that a state may condition the right of a foreign corporation to do business in the state on compliance with, and agreement to, all reasonable regulations. This is the sense of the concise and logical concurring opinion of Mr. Justice Frankfurter in Watson v. Employers Liability Assur. Corp., 348 U.S. 66, 75 S. Ct. 166, 99 L. Ed 74. The right may not be conditioned, of course, upon compliance with regulations which are repugnant to the Constitution of the United States, Power Manufacturing Co. v. Saunders, 274 U.S. 490, 47 S. Ct. 678, 71 L. Ed. 1165, and Wheeling Steel Corp. v. Glander, 337 U.S. 562, 69 S. Ct. 1291, 93 L. Ed. 1544 (Statutes denying equal protection of the laws in violation of the Fourteenth Amendment through unreasonable and arbitrary discrimination in favor of domestic corporations), or with those which require the surrender of constitutional rights. Terral v. Burke Construction Co., 257 U.S. 529, 42 S. Ct. 188, 66 L. Ed. 352 (The right to litigate in Federal Courts); Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 46 S. Ct. 331, 70 L. Ed. 664

(The right to pay commissions to agents outside of the state for services rendered outside of the state) ; Hanover Fire Ins. Co. v. Harding, 272 U.S. 494, 47 S. Ct. 179, 71 L. Ed. 372 (The right to refuse to pay an unconstitutional tax).

The Supreme Court of the United States has consistently recognized the right of the states to regulate the insurance industry in its operations affecting the public welfare, both before and since passage of the McCarran Act. 15 U.S.C. Secs. 1011-1015. This is manifest from Osborn v. Ozlin, 310 U.S. 53, 60 S. Ct. 758, 84 L. Ed. 1074, Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 63 S. Ct. 602, 87 L. Ed. 777, Watson v. Employers Liability Assur. Corp., 348 U.S. 66, 75 S. Ct. 166, 99 L. Ed. 74, Robertson v. California, 328 U.S. 440, 66 S. Ct. 1160, 90 L. Ed. 1366, Travelers Health Ass'n. v. Virginia, 339 U.S. 643, 70 S. Ct. 927, 94 L. Ed. 1154, California State Auto Ass'n. v. Maloney, 341 U.S. 105, 71 S. Ct. 601, 95 L. Ed. 788, Federal Trade Com. v. National Cas. Co., 357 U.S. 560, 78 S. Ct. 1260, 2 L. Ed. 2d 1540, and a host of other cases. Indeed, the Congress has expressly recognized the right, as limited by Supreme Court decisions, by passage of the McCarran Act. In speaking of that Act and its purpose in Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 66 S. Ct. 1142, 90 L. Ed. 1342, 164 A.L.R. 476, 494, the Court said:

"Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects.

"Moreover, in taking this action Congress must have had full knowledge of the nation-wide existence of state systems of regulation and taxation; of the fact that they differ greatly in the scope and character of the regulations imposed and of the taxes exacted; and of the further fact that many, if not all, include features which, to some extent, have not been applied generally to other interstate business. Congress could not have been unacquainted with these facts and its purpose

was evidently to throw the whole weight of its power behind the state systems, notwithstanding these variations."

The writing of group insurance is a comparatively new but rapidly expanding form of underwriting in the field of life and health and accident insurance. Its cost is low and its appeal is great. As is pointed out in Board of Ins. Com'rs v. Great Southern Life Ins. Co., 150 Texas 258, 239 S.W. 2d 803, 808, whereas the Legislature of this state moved into the field of individual life insurance contracts with regulations as early as 1909, it did not recognize an existing necessity for regulation of the writing of group insurance until 1931. It was in that year that Art 4764a, V.A.T.C.S., the forerunner of Art. 3.50, Texas Insurance Code, was enacted. See Acts 42d Leg., Reg. Ses., Ch. 101, p. 172. The power of the Legislature to regulate group underwriting is not in question here, but the problem considered necessarily raises the question of the power of the Legislature to exclude members of trade associations and their employees from the groups made eligible for group insurance in this state. For, as we view the matter, if, and only if, the Legislature was without constitutional power to exclude them from the eligible groups is the cancellation of Respondent's permit a denial of due process or a violation of the full faith and credit clause of the Constitution.

While ordinarily there are only two parties to a contract of group insurance, it affects the interests of four parties—the insurer, the employer, labor union, creditor, trade association or other contracting party, the insured and the beneficiary. Rivers v. State Capital Life Ins. Co., 245 N.C. 461, 96 S.E. 2d 431, 68 A.L.R. 2d 205. The manner in which it affects the interests of the insured and the beneficiary is no less vital than the manner in which it affects the interests of the contracting parties. It "is not indemnity insurance for the benefit of the employer, but insurance upon the life of the employee for his personal benefit and the protection of those depending upon him, * * *." 29A Am. Jur. 834, Sec. 1758. More often than not the nature of the coverage and its continued existence bears importantly upon the insured's decision of whether to purchase or to keep in force other insurance to protect those closest to him against debt and hardship. Under the rule followed in many jurisdictions a group policy may be cancelled without the consent of the insured, and in some even without notice to him. 29A Am. Jur. 856, Sec. 1783; 68 A.L.R. 2d 249. By the time of cancellation the insured may have become uninsurable, or at the very least the premium he must pay for an individual contract will have increased. Often the insured pays a part of the premium on the group policy.

Rarely will he have an opportunity to examine the master policy personally, and neither will he have its intricate and complicated coverages, exclusions and exceptions explained by a local agent in whom, as a friend or neighbor, he has confidence and upon whose judgment as to the type of coverage best meeting his needs he would normally rely. All of these factors also weigh heavily upon the interests of the beneficiary.

It is not pure speculation to say that usually the beneficiary and the insured are residents of the same state. The state of residence of the insured and beneficiary thus has the interests of two of the four parties affected by the contract to protect. The manner in which the state seeks by regulations to protect their interests should not be confined within narrow boundaries by strict limitations merely because the group insurance contract is made or is to be performed in another state. This is the sense of the statement made by the Supreme Court of the United States in Travelers Health Ass'n v. Virginia, 339 U. S. 643, 647-648, 70 S. Ct. 927, 94 L. Ed. 1154, 1161, when it said:

> "In Osborn v. Ozlin, 310 U.S. 53, 62, 84 L. Ed. 1074, 1077, 60 S. Ct. 758, we recognized that a state has a legitimate interest in all insurance policies protecting its residents against risks, an interest which the state can protect even though the 'state action may have repercussions beyond state lines * * * .' And in Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316, 87 L. Ed. 777, 781, 63 S. Ct. 602, 145 A.L.R. 1113, we rejected the contention, based on the Benn case among others, that a state's power to regulate must be determined by a 'conceptualistic discussion of theories of the place of contracting or of performance'. Instead we accorded 'great weight' to the 'consequences' of the contractual obligations in the state where the insured resided and the 'degree of interest' that state had in seeing that those obligations were faithfully carried out."

Not all states will view the problems of the affected parties alike. As indicated by the quotation from Prudential Ins. Co. v. Benjamin, supra, the nature of regulations may be expected to vary somewhat from state to state. Usually there is sound basis for variation. In this state, for example, if the premium contribution made by a married insured is from ordinary income, one half of the contribution is the property of the spouse, and if the spouse is the beneficiary, he or she has a two-fold interest in the policy. This is not true in most other states.

Much of what is said here was in our thinking when we sus-

tained the constitutionality of Art. 4764a (Art. 3.50) in Great Southern in the face of a charge that it denied equal protection of the law in violation of the Fourteenth Amendment by authorizing group insurance for members of labor unions while denying it to employees of members of trade associations. Our holding in that case was predicated on the right of the Legislature to limit the writing of group insurance to situations where there was "a close relationship and an affinity of interests" between those making up the insured group and the person or agency contracting with the insurer for the insurance.

■ We do not believe, and are not prepared to say, that the Legislature of this state was without constitutional power to exclude trade association members and their employees from the groups made eligible for group insurance. There is not the same need for loyalty from the insured that exists on the part of the employer or labor union groups and the corresponding obligation for obtaining and retaining the best coverage available at the lowest cost does not exist. Therefore, Art. 3.50 is not repugnant to the equal protection clause of the Constitution of the United States. And inasmuch as the statute represents a reasonable exercise of the power of the state to protect the vital interests of its citizens, respondent has no constitutional right to violate it. It follows that conditioning the right of respondent to continue to do business in this state upon cancellation of its group coverage of NASD members and employees in this state violates neither the due process nor the full faith and credit provisions of the Constitution. The State of Texas does not seek by enforcement of Sec. 4 of Art. 3.50 to prohibit respondent from keeping in force the group insurance contract it made with the Trustees, nor does it seek to invalidate that contract or to modify any of its terms. It does not even seek to deny respondent the right to apply the coverage of the contract to residents of Texas. It seeks only to take away from a foreign insurance corporation what is finally and essentially a privilege if it insists upon applying the contract, which would be unlawful if made in this state, to residents of the state. This does not deny full faith and credit to the laws of the state where the contract was made.

■ Respondent's contention that conditioning its right to continue to do business in this state on cancellation of the coverage of the group in this state imposes an undue burden on interstate commerce may be disposed of in short order. Foreign and domestic insurers alike are prohibited from writing group insurance covering trade association members and employees; Art. 3.50 admits of no discrimination against respondent. Only 192

of the 3870 member firms of NASD are Texas firms; of 7989 lives covered by the group policy only 198 are Texas lives; and the insurance coverage of Texas lives is only $1,427,500 of a total coverage under the policy of $87,885,600 in the United States. Impact of cancellation of the Texas coverage on interstate commerce is minuscule. The statute being constitutional and not unreasonable, its impact on interstate commerce is authorized by the McCarran Act.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered January 7, 1962.