**MASSACHUSETTS INDEMNITY AND LIFE INSURANCE COMPANY, Appellant,**

**v.**

**TEXAS STATE BOARD OF INSURANCE, and Tom Bond, Commissioner of Insurance, Appellees.**

**No. 14,153.**

Court of Appeals of Texas,
Austin.

Jan. 16, 1985.

John L. Freeman, Michael Caolo & Associates, Dallas, for appellant.

C. Dean Davis, Davis & Davis, Austin, for Texas Ass'n of Life Underwriters.

Jim Mattox, Atty. Gen., Bradley Seals, Asst. Atty. Gen., Austin, for The State of Tex., Texas State Bd. of Ins., Tom Bond, Com'r of Ins.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

POWERS, Justice.

Massachusetts Indemnity and Life Insurance Company (MILICO) appeals from a trial court judgment holding constitutional section 10 of The Texas Agents Qualification and License Law for Agents of Legal Reserve Life Insurance Companies, Tex. Ins.Code Ann. art. 21.07–1 (1981 & Supp. 1984).[1] MILICO contends section 10 is unconstitutional on the several grounds which we shall discuss below. Believing these contentions to be without merit, we will affirm the judgment of the trial court.

---

1. MILICO sued the State in a statutory cause of action for declaratory judgment, as authorized by the Uniform Declaratory Judgments Act, Tex. Rev.Civ.Stat.Ann. art. 2524–1 (Supp.1984).

### THE STATUTES CHALLENGED BY MILICO ON CONSTITUTIONAL GROUNDS—PRESUMPTIONS

The statutory provisions challenged by MILICO are included in article 21.07–1, *supra*, a statute that provides generally for the training, licensing, duties, and other regulation of "legal reserve life insurance agents," a discrete class of insurance agents. (Other classes of insurance agents are governed in a similar way by another statute, Tex.Ins.Code Ann., *supra*, art. 21.-07.)

Section 10, the specific part of the statute attacked by MILICO on constitutional grounds, deals with the subject of *temporary* life insurance agents' licenses, issuable by the "Life Insurance Commissioner" (the Commissioner of Insurance) when he is satisfied with the honesty and trustworthiness of the applicant for such a license.[2] The license, effective for a period of 90 days, is issuable on certain conditions specified in section 10. Among these conditions are three of which MILICO complains.

1. The first requires that an agent's application for the temporary license be accompanied by a certificate, executed by the insurer whom the agent will represent, to the effect that the agent "has been appointed or is being considered for appointment by such insurer as its full-time agent...." (§ 10(b)(1)).

2. The second provides that an "insurer may make no more than two hundred and fifty temporary licensee appointments during a calendar year...." (§ 10(e)).

3. The third provides that an agent holding only a temporary license "may not engage in any insurance solicitation, sale, or other agency transaction that results in or is intended to result in the replacement of any existing individual life insurance policy form or annuity contract that is in force...." (§ 10(b)(4)).

MILICO contends that each of these three statutory provisions violates the due-process and equal-protection guarantees of the State and federal constitutions. Tex. Const. Ann. art. I, §§ 3, 19 (1984); U.S. Const. amend. XIV, § 1.

We presume of course that the legislature intended its enactment to be in conformance with any constitutional requirements and construed accordingly. Therefore, every reasonable intendment and presumption will be made in favor of the constitutionality of the enactment; and if there could exist a state of facts justifying legislative classifications or restrictions, the reviewing court will assume its existence. *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632 (1958); *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162 (1959); *Reed v. City of Waco*, 223 S.W.2d 247 (Tex.Civ.App.1949, writ ref'd). The burden of persuasion rests upon the one asserting the unconstitutionality of the enactment to point out precisely how a constitutional principle has been violated. *Duncan v. Gabler*, 147 Tex. 229, 215 S.W.2d 155 (1948); *Jefco, Inc. v. Lewis*, 520 S.W.2d 915 (Tex.Civ.App.1975, writ ref'd n.r.e.). Aside from these presumptions of constitutionality, the legislature, in its enactment of a statute regulating a business activity, is presumed to be familiar with the manner in which the business was conducted at the time. *Western Co. v. Sheppard*, 181 S.W.2d 850 (Tex.Civ.App.1944, writ ref'd). It is under these presumptions that we must view and evaluate MILICO's contentions of unconstitutionality.

### DUE PROCESS AND EQUAL PROTECTION

#### *Equal Protection*

We believe it beyond dispute that the legislature has the power to license and regulate insurance agents "for the protection of the public in respect to the purchase and sale of insurance policies." *Great National Life Insurance Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964). *See generally*

---

**2.** All the powers and responsibilities of the "Life Insurance Commissioner" are presently vested in the State Board of Insurance and administered by the Commissioner of Insurance. *See* Tex.Ins.Code Ann. art. 1.02(c) (1981).

16 Appleman, Insurance Law and Practice §§ 8631–8636 (1981).

■ The three statutory provisions challenged by MILICO obviously distinguish quite significantly between different classes of persons engaged in the insurance business. It is not argued in the present case that any fundamental interest or suspect class is involved. Therefore, in testing such economic regulation against the equal-protection clause of the 14th Amendment, the applicable standard is whether the statutory classification and different treatment bear a "rational relationship" to a legitimate state interest which the statute is designed to further. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). The ultimate scope of this standard is quite narrow:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is *so unrelated* to the achievement of any combination of *legitimate purposes* that *we can only conclude that the legislature's actions were irrational.*

*Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979) (emphasis added). The rational-relationship standard serves also as the measure by which to judge an invocation of the corollary provision of the Texas Constitution found in the Texas Bill of Rights, Tex. Const. Ann. art. I, § 3 (1984). *Lubbock Poster Co. v. City of Lubbock*, 569 S.W.2d 935, 944 (Tex.Civ. App.1978, writ ref'd n.r.e.).

1. *Limited Number of Temporary Licenses.* MILICO contends the statutory classifications distinguish arbitrarily and capriciously between those insurers appointing more than 250 temporary licenses each calendar year and those appointing less than that number. It is obviously true

that in one sense the legislative choice of 250 was "arbitrary," for it may reasonably be argued that 251 or 249 would have furthered with equal effectiveness any State regulatory interest. But the test to be applied to the statutory figure does not address whether it is an ideal or correct number, but whether 250 "is so unrelated to the achievement of any combination of legitimate purposes that we may only conclude that the" legislature was *irrational* in selecting that number. *Vance, supra.* We obviously may not so conclude in the present case.

Leaving for a moment the action of the legislature in selecting the number 250, we turn first to the question of whether the legislature could act at all to limit the number of insurance agents an insurer may certify for temporary licenses. On what legitimate ground could the legislature base a decision that the number of temporary licensees should be limited?

The original act, which provided for the temporary licensing of agents, did not set a limit on the number of such temporary licenses. But the emergency clause of that original enactment is instructive of the State purposes designed to be served in regulating legal reserve life insurance agents generally, including that aspect dealing with temporary licenses. The Legislature found an emergency in:

> [t]he fact that under existing law life insurance agents for legal reserve life insurance companies authorized to do business in Texas are not required to establish their qualifications and competence in the field of life insurance as a condition to obtaining license to sell life insurance in Texas; the further fact that it is in the public interest that the purchasers of legal reserve life insurance in Texas have assurance that the life insurance agents are competent, qualified and trustworthy; and the further fact that the existing statutes of Texas are wholly inadequate to accomplish the foregoing purposes....

1955 Tex.Gen.Laws, ch. 213, § 18, at 629.

■ These purposes being patently legitimate, are they rationally served by limit-

ing the number of temporary licensees and is the number 250 so unrelated to them as to be irrational? The 1955 enactment did not limit in any respect the number of temporary licenses although it did contain the two other provisions of which MILICO complains. Section 10, as presently constituted, is rather plainly intended to allow training by the insurer of its new agents, subject to the public being protected during the course of such training. For example, temporary licenses are not renewable and may not be issued to the same individual more than once in a specified period of time; the insurer must certify that the temporary licensees have at least an expectation of full-time employment on expiration of the temporary license and their training period; the temporary licensees may not solicit or sell a policy in replacement of existing individual life insurance policies; and so forth. That the temporary licensing scheme is a training device is shown in subsection (b)(6) where it is provided that the Commissioner may cancel or suspend an insurer's right to engage such temporary licensees if the insurer has "abused" the right, as indicated by such things as a failure of a number of the temporary licensees of a given company to pass the examination required for regular appointment, the percentages being specified in subsection (d) of section 10.

In limiting the number of temporary licensees to 250 in any calendar year, the legislature presumably intended to balance the public interest mentioned above against what it presumably knew: that some insurers subject to the statute engage more temporary licensees than others. *See New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Reed v. City of Waco, supra.* Limiting the number to 250 would presumably permit better supervision and control of temporary licensees by the insurers who use and train them, and hence better training and better management of their contacts with the insurance-buying public until such time as the Commissioner shall by examination "determine [their] competence with respect to insurance and annuity contracts and [their]

familiarity with the pertinent provisions of the laws of this State...." Tex.Ins.Code Ann. art. 21.07–1, § 5(a) (Supp.1984).

It may be true, as MILICO contends, that the legislature did not first "demonstrate" how limiting the temporary licensees to 250 for any one insurer, in any calendar year, would advance a legitimate State purpose; and it might even be true that "studies" show 250 is an unwise choice. Moreover, the number 250 is admittedly not itself "supported by any legislative findings of fact." But, we are aware of no requirement that the legislature support its enactment by such "findings of facts." And, "[t]he considerations upon which such classifications shall be based are primarily within the discretion of the Legislature," and the judicial branch may interfere only when "it is made clearly to appear that there is no reasonable basis for the attempted classification." *Hurt v. Cooper*, 130 Tex. 433, 110 S.W.2d 896, 900–01 (1937).

It has not, in the present case, been made to appear that the 250 dividing line has no reasonable basis and it is presumptively constitutional and reasonable as a statutory enactment. MILICO may show that 500 was a more reasonable number in the circumstances, but that does not suggest that 250 is unreasonable. "We do no sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems...." *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). And a litigant "may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Indeed, the very evidence cited in MILICO's brief in this Court indicates that the legislature perceived abuses in the employment of temporarily licensed agents, and we suppose it could reasonably select the number 250 merely to ascertain *whether* that would not reduce the abuses by assuring better

supervision by insurers.[3] "The lines must be drawn somewhere, and the authorities above cited hold that the determination of where to draw them is for the Legislature and not for the courts." *Hurt v. Cooper, supra,* at 903.

Nevertheless, MILICO claims that the number 250 (as well as most of the objectionable parts of the statute—even, we presume, those that were contained in the original 1955 enactment) resulted from intense lobbying of the legislature by MILICO's commercial competitor—the Texas Association of Life Underwriters (TALU) which employs no temporarily licensed agents. We think it manifest that almost all legislation is procured through the efforts of some interested persons. We do not see how that affects the issue of whether the resulting statute was within the constitutional limits permitted the legislature in making statutory law. We are not certain therefore what legal proposition MILICO intends by its assertion but it resurrects the words used by Justice Murphy in a similar case: "It is said that the 'insurance lobby' obtained this statute ... But a judiciary must judge by results, not by the varied factors which may have determined legislators' votes." *Daniel v. Family Security L. Ins. Co.,* 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632 (1949).

Appellant's reliance on *Ground Water Conservation Dist. No. 2 v. Hawley,* 304 S.W.2d 764 (Tex.Civ.App.1957, writ ref'd n.r.e.) is misplaced. There, the court found *no* rational basis for legislation which effectively excepted from property taxes tracts of land of a size more than 639 acres. *See also Prudential Health Care Plan v. Com'r of Ins.,* 626 S.W.2d 822 (Tex.App.1981, writ ref'd n.r.e.) (no rational basis for imposing the entire administrative cost of regulation on corporate, as opposed to non-corporate, health maintenance organizations when they were, for all other regulatory purposes, treated exactly the same).

2. *Selling or Soliciting Replacement Policies by Temporary Licensees.* MILICO next attacks, on a theory that it was denied equal protection of the laws, that part of the statute which forbids temporarily licensed agents to sell or solicit insurance policies in replacement of existing policies held by a prospective purchaser. We find a rational basis for this section as well, under the authorities mentioned above. The legislature presumably intended to minimize potential harm to the holders of life insurance policies that might be occasioned by ill-considered advice given by agents not yet sufficiently trained and knowledgeable to analyze and compare accurately an existing policy in reference to any suggested replacement. *Cf. Houston-American Life Insurance Co. v. Tate,* 358 S.W.2d 645, 657 (Tex.1962) (purpose of another statute providing for licensing of casualty-insurance agents "was to afford to the citizens of Texas ... the protection which comes from having independent agents counsel and help them in their insurance affairs"). Appellant rejoins by a contention that the same end could be achieved by forbidding *all* inexperienced insurance salesmen from such sales or solicitations. This is, of course, contrary to the fundamental proposition that the Commissioner, under the legislative scheme, determines trustworthiness and competence *after* examination, as stated in § 5 of the statute. And, it is well-settled that, in economic legislation, it matters not that the statute is significantly underinclusive or overinclusive. *Vance v. Bradley, supra,* at 108, 109, 99 S.Ct. at 57–58. Perfect congruence is not required between the law's justification for class legislation and the class enjoined from enjoying a licensed privilege. We may not overturn the statute "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only con-

---

**3.** "The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least make the evil less." *Liggett Co. v. Baldridge,* 278 U.S. 105, 115, 49 S.Ct. 57, 60, 73 L.Ed. 204 (1928) (Holmes, J., dissenting).

clude that the legislature's actions were irrational." *Vance v. Bradley, supra.* In summary, the Legislature acted well within its power when it attempted to further and adjust the competing goals of proper training and public protection. *Vance v. Bradley, supra; Daniel v. Family Security L. Ins. Co., supra.*

Appellant's reliance on *Ex parte Dreibelbis,* 133 Tex.Cr.R. 83, 109 S.W.2d 476 (1937) is unjustified because the court there dealt with a taxing ordinance for which *no* rational basis could be supposed.

**3.** *Classifications Based on Full and Part-Time Agents as Temporary Licensees.* MILICO's last equal-protection contention sets forth two basic arguments. The first is that the provision which allows insurers to obtain the temporary licenses for its agents only when they have been appointed for full-time service or are being considered for full-time service discriminates invidiously between full and part-time agents. We do not believe that MILICO, even though it is an employer of part-time agents, has standing to raise this issue *jus tertii. Erie R. Co. v. Williams,* 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155 (1914). *Cf. Herbring v. Lee,* 280 U.S. 111, 50 S.Ct. 49, 74 L.Ed. 217 (1929) (A state statute imposing a $500 fee for each additional agent beyond a prescribed number employed by a foreign insurance company does not deny equal protection of the laws to one seeking appointment as such agent, for it does not impose a restriction upon him but rather a fee imposed only upon the foreign insurer as a condition precedent to its right to appoint the additional agent— "[i]t is plainly no interference whatever with the right of the individual to carry on the business of an insurance agent, or class legislation in this respect"). This is not a case in which the third parties on whose behalf appellant is arguing are *unable to assert* their own rights; nor is the constitutional right asserted—freedom from economic discrimination—of sufficient weight to permit standing to raise the argument. *Cf. Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (vendor permit-

ted to assert *jus tertii* the interests of vendees who were the targets of gender-based legislation); *see also* Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599, 646 (1962).

MILICO's second argument is to the effect that the distinction between full and part-time work distinguishes invidiously between *employers,* that is, between those who employ part-time agents and those who do not, to the detriment of the former. We find the distinction fully justified by the factors we have enumerated at length above which pertain to assuring the competence and training of agents while simultaneously protecting the public from the ill effects of their lack of training and competence. We need not belabor them further. The validity of a regulation specifying what persons may act as insurance agents for companies authorized to do business in the State is not to be judged by abstracting a particular item covered by that regulation and evaluating it in isolation. *Osborn v. Ozlin,* 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940). Moreover, even if the regulation affects only a few it does not thereby deny equal protection for that reason alone. *Daniel v. Family Security L. Ins. Co., supra* (statute that prohibited undertakers from acting as agents for life insurance companies is not, as applied to a single company in a case where parties to insurance contracts contemplate use of the proceeds to pay for funeral expenses, violative of either the due-process or equal-protection guarantees of the Constitution of the United States).

## SUBSTANTIVE DUE PROCESS

MILICO also attacks the aforementioned statutory provisions on the ground of substantive due process. The due-process clause of the federal constitution, in this respect, places the same restrictions on the exercise of state legislative power as the similar clause in the Texas Constitution. Tex. Const. Ann. art. I, § 19 (1984); *Mellinger v. City of Houston,* 68 Tex. 36, 37, 3 S.W. 249 (Tex.1887);

*Lively v. Missouri, K. & T. Ry. Co. of Texas*, 102 Tex. 545, 120 S.W. 852 (1909). At a constitutional minimum, then, our duty under both the state and federal constitutions is to test the statute to see whether the means are rationally related to a legitimate end. For the reasons already stated in support of the classifications made by the statute, we find that the statute rationally furthers legitimate state purposes by allowing for the training of agents under conditions which protect the insurance-buying public. Moreover, our review of Texas cases inclines us against giving broader scope to § 19 than the federal constitution affords in cases of this kind. *See, e.g., Thompson v. Calvert*, 489 S.W.2d 95, 99 (Tex.1972) (quoting from *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1933)).

## DUE PROCESS—VAGUENESS

Before addressing appellant's vagueness contentions, we note a few of the guidelines established by state and federal courts for measuring vagueness, bearing in mind the fundamental presumption of constitutionality accorded all legislation. *Prudential Health Care Plan, supra.* The standards for measuring vagueness are less stringently applied to non-criminal regulations, particularly economic legislation. *Ely v. State*, 582 S.W.2d 416 (Tex.Cr. App.1979); *Record Head Corp. v. Sachen*, 682 F.2d 672 (7th Cir.1982). Moreover, a statute is not unconstitutionally vague simply because it could have been drafted with greater precision. *Harper v. Lindsay*, 616 F.2d 849 (5th Cir.1980).

The general standard for gauging vagueness was laid down by the United States Supreme Court in *Jordan v. De George*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), and has reappeared in various forms in subsequent decisions. Thus, for example, courts have sought to determine whether the language of the statute conveys sufficiently definite warning, *Jordan, supra;* whether men of common intelligence must necessarily guess at its meaning, *Keyishian v. Board of Regents of New York*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (emphasis supplied), *Sanders v. State Department of Public Welfare*, 472 S.W.2d 179 (Tex.Civ.App.1971, writ dism'd); whether a person of ordinary intelligence runs a substantial risk of miscalculation in seeking to comply with the statute, *Texas Liquor Control Board v. Attic Club, Inc.*, 457 S.W.2d 41 (Tex.1970) (emphasis supplied); and whether an ordinary person could sufficiently understand and comply with the statute, *CSC v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

Courts have experienced difficulty applying these general standards, since practically all legislation is ambiguous at its periphery. Persons of ordinary intelligence must necessarily guess at a statute's meaning with respect to marginal situations. Thus more recent opinions have refined the general standard. Some courts have searched the questioned statute for an "ascertainable core meaning," and others have held that a statute is unconstitutionally vague on its face only when it cannot validly be applied in any context. *Basiardanes v. City of Galveston*, 682 F.2d 1203 (5th Cir.1982); *Brache v. County of Westchester*, 658 F.2d 47 (2nd Cir.1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982). *See also DiLeo v. Greenfield*, 541 F.2d 949 (2nd Cir.1976). It is apparent that the above guidelines, whether general or refined, differ somewhat in scope. With this in mind, we turn to appellant's two contentions relative to vagueness.

1. *"Replacement" Policies.* Section 10 of the statute contains a provision which forbids temporarily licensed agents to engage "in any insurance solicitation ... that results in ... the replacement of any existing life insurance form..." MILICO contends the word "replacement," as used in the section, is unconstitutionally vague. It argues that an agent has no way of verifying that the customer does not already have existing life insurance coverage and that "there is a substantial risk of miscalculation by those subject to the regu-

lation...." MILICO, then, claims the statute is vague but *argues* that it is *harsh* because an unsuspecting agent might be misled by the owner of an existing life insurance policy who conceals the fact, secretly intending to cancel the existing policy if he purchases a substitute from the temporary licensee, or who merely forgets to mention the existing policy and decides later to cancel it after purchasing another from the temporary agent. An act of the legislature will not be declared unconstitutional merely on the grounds that it is harsh, unwise, or impolitic. *Texas State Board of Public Accountancy v. Fulcher*, 515 S.W.2d 950 (Tex.Civ.App.1974, writ ref'd n.r.e.). MILICO does not, by its argument of harshness, show that the word "replacement" is vague, nor do we find it to be so on our own appraisal. It plainly means, in context, that temporary licensees may not solicit the sale of a life insurance policy *as a substitute* for an existing life insurance policy, a prohibition patently founded upon the temporary licensees' likely incompetence in the matter of comparison. The statutory expression complained of by MILICO is as definite a declaration by the legislature as could be expected and is, no doubt, clearly understood as to its essential import by one affected thereby. A person reading it in good faith cannot misunderstand what the expression means.

 2. *Full-Time Employment.* The statute requires that an insurer certify to the Commissioner of Insurance that each applicant for a temporary license has been appointed a "full-time" agent or is being considered for "full-time" appointment. We believe that an ordinary person seeking to conform his behavior to this requirement can be confident that certifying as "full-time" an agent who works or will work solely for the insurer 40 hours a week *complies* with the statute. He may also fairly suppose that certifying as "full-time" an agent who works only four hours a week *violates* the statute. The existence of the valid application alone is enough to uphold the statute under some of the cited cases. *Basiardanes v. City of Galveston, supra.* Moreover, we believe that a person

of ordinary intelligence, reading the statute in good faith, need not of necessity guess as to its meaning, at least in so far as there exist obvious and reasonable interpretations by which he can be guided. The phrase obviously contemplates a normal or standard work period in business generally. Indeed, as in the matters of "replacement" mentioned above, MILICO's argument does not appear to be so much that the statute is incomprehensible as that the rather obvious interpretations are onerous to it as an employer of temporary licensees on a part-time basis.

We overrule the points of error pertaining to the allegations of vagueness.

## MOTION TO STRIKE INTERVENTION

 MILICO claims by his seventh point of error that the trial judge abused his discretion when he denied appellant's motion to strike a plea in intervention filed by appellee Texas Association of Life Underwriters (TALU). Tex.R.Civ.P.Ann. 60 (1979 & Supp.1984); *Roberson v. Roberson*, 420 S.W.2d 495 (Tex.Civ.App.1967, writ ref'd n.r.e.). Even were we to agree that the trial judge committed error, we do not think it was such as to call for reversal of the judgment. *See* Tex.R.Civ.P.Ann. 434 (1967 & Supp.1984). MILICO argues that TALU's intervention "complicated the case ... by raising issues that were not material...." The trial judge ruled that the evidence introduced by TALU was material, and even if we think the intervention improper, we agree with his rulings on materiality. In any case, we do not think the judge's action unduly complicated the proceedings or constituted an abuse of discretion.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

 In its final point, MILICO complains of the trial court's failure to file additional findings of fact and conclusions of law. The trial judge filed his initial conclusions of law pursuant to appellant's timely request. MILICO claims that, be-

cause of the failure to file additional findings of fact and conclusions of law, he "is precluded from making a complete presentation of his case." Beyond this rather bare assertion, however, MILICO does not argue precisely how his presentation on appeal has been prejudiced. The transcript contains MILICO's suggested findings of fact. We have read them. We hold that the trial judge made findings on all the controlling issues—though some of these findings are labeled conclusions—and directly or indirectly disposed of all MILICO's suggested findings. *Wentz v. Hancock,* 236 S.W.2d 175 (Tex.Civ.App.1951, writ ref'd).

The judgment is affirmed.[4]

PHILLIPS, C.J., not participating.

---

**4.** We do not fail to appreciate the economic burden placed upon MILICO by the provisions of § 10 and our consideration of them. The power of the legislature to enact class legislation always poses a possibility that the legislature will abuse that power. It may even be that class legislation is justified on grounds that are in fact illusory, or that the appearance of legitimate economic ends is really a cloak for a legislative body's irrational prejudice toward the disadvantaged class. However, we are bound by precedent as we understand it—precedent that has flowed partly from the historical results which follow judicial attempts at making economic policy by striking down statutes "because

they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). "That era long ago passed into history." *Dandridge v. Williams,* 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Nor do we have the capacity to ascertain the subjective motivation with which the legislature acted. "[W]e cannot undertake a search for motive in testing constitutionality." *Daniel v. Family Security L. Ins. Co., supra.* Rather, any remedy lies in such cases in the political process and a responsive legislature.